Hilton V. and Gertrude D. Carter v. Commissioner. Hilton V. Carter, Sr. v. Commissioner. Hilton V. Carter, Sr., and Gertrude Coxe v. Commissioner. Gordon H. and Carrie Mae Brame v. Commissioner. Brame & Carter, Inc. v. Commissioner.
Carter v. Commissioner
Docket Nos. 48292, 53519-53521, 67601-67604 * .
United States Tax Court
T.C. Memo 1960-205; 1960 Tax Ct. Memo LEXIS 82; 19 T.C.M. (CCH) 1090; T.C.M. (RIA) 60205; September 30, 1960
*82 Held: ( 1) that certain monthly payments made by the corporate petitioner, which operated an automobile dealership, to its stockholders, the individual petitioners, constituted dividends to such individuals rather than loans and that certain weekly payments so made were salaries taxable to the individuals rather than payments for travel and entertainment on behalf of the corporation; (2) that the individuals diverted to themselves income of the corporation arising from corporate accounts receivable and from finance company payments from dealer reserve accounts and upon the discount of notes; (3) that respondent properly computed unreported income from some sources by the bank deposit and cash expenditures method, except in certain respects as corrected herein; (4) that the individual petitioners were not engaged in farming operations for profit and that claimed farm losses are not deductible; (5) that some part of the deficiency of each individual petitioner for each year involved was due to fraud with intent to evade tax and that they are liable for additions to tax under section 293(b) of the Internal Revenue Code of 1939; (6) that the individual petitioners are liable *83 for additions to tax for failure to file declarations of estimated tax for each year under section 294(d)(1)(A) of the Internal Revenue Code of 1939 (except that the petitioner Carter is not liable for such additions for the years 1948 and 1949); but that they are not liable for additions to tax under section 294(d)(2); and (7) that the corporate petitioner has failed to show error in respondent's determination of unreported income. Clint L. Pierson, Esq., and William E. Logan, Esq., Gulfport, Mass., for the petitioners. Towner S. Leeper, Esq., for the respondent. ATKINS
Memorandum Findings of Fact and Opinion
*84 ATKINS, Judge: The respondent determined deficiencies in income taxes and additions thereto against Hilton V. Carter and Gertrude Coxe (formerly Gertrude D. Carter, wife of Hilton V. Carter), as follows: Docket
Additions to Tax [1]
No.
Year
Income Tax
293(b)
294(d)(1)(A)
294(d)(2)
48292
1948
$ 5,958.86
48292
1949
4,655.16
53519
1950
9,226.18
$ 4,613.09
$ 830.45
$ 553.62
67602
1951
4,779.96
2,389.98
334.57
286.78
67602
1952
10,400.34
5,200.17
728.03
624.02
In Docket Nos. 48292 and 67602 by amended answer or amendment to answer the respondent made claim for deficiencies in tax and additions thereto for certain years, in lieu of those originally determined, as follows: Docket
Additions to Tax
No.
Year
Income Tax
293(b)
294(d)(1)(A)
294(d)(2)
48292
1948
$15,175.02
$ 7,587.51
$1,108.26
$ 949.93
48292
1949
15,203.02
7,601.51
1,064.20
912.18
67602
1951
10,061.50
5,030.75
704.31
603.69
67602
1952
12,564.94
6,282.47
879.54
753.90
The respondent determined a deficiency in income tax and *85 additions thereto against Hilton V. Carter for 1953 as follows: Docket
Additions to Tax
No.
Year
Income Tax
293(b)
294(d)(1)(A)
294(d)(2)
67601
1953
$ 1,984.70
$ 992.35
$ 167.33
$ 143.42
By amended answer in Docket No. 67601, the respondent made claim for increased deficiency in tax and additions thereto, in lieu of those originally determined, as follows: Docket
Additions to Tax
No.
Year
Income Tax
293(b)
294(d)(1)(A)
294(d)(2)
67601
1953
$ 5,227.98
$ 2,613.99
$ 394.35
$ 338.02
The respondent determined deficiencies in income tax and additions thereto against Gordon H. and Carrie Mae Brame as follows: Docket
Additions to Tax
No.
Year
Income Tax
293(b)
294(d)(1)(A)
294(d)(2)
53520
1948
$18,219.38
$ 9,109.69
$1,726.70
$1,151.13
53520
1949
26,082.06
13,041.03
2,400.77
1,600.51
53520
1950
15,040.34
7,520.17
1,378.91
919.28
67603
1951
5,868.98
2,934.49
420.89
360.76
67603
1952
4,375.78
2,187.89
319,36
273.74
67603
1953
1,986.90
993.45
174.27
149.38
By amended answer in Docket No. 67603, the respondent made claim *86 for increased deficiencies in income tax and additions thereto, in lieu of those originally determined, as follows: Docket
Additions to Tax
No.
Year
Income Tax
293(b)
294(d)(1)(A)
294(d)(2)
67603
1951
$10,757.82
$ 5,378.91
$ 763.09
$ 654.09
67603
1952
7,850.44
3,925.22
562.58
482.22
67603
1953
6,003.24
3,001.62
455.42
390.36
The respondent determined deficiencies in income tax and additions thereto against Brame and Carter, Inc., as follows: Additions
Docket
Fiscal Year
Income
to Tax
No.
Ending
Tax
293(b)
53521
Jan. 31, 1949
$20,139.27
$10,069.64
53521
Jan. 31, 1950
21,770.08
10,885.04
53521
Jan. 31, 1951
24,364.25
12,182.13
67604
Jan. 31, 1952
4,317.69
With respect to the individual petitioners the principal issues are: (1) whether certain weekly payments received by them from the corporate petitioner and designated as travel and entertainment expense, and monthly payments received from the corporation are taxable as dividends or salary; (2) whether they also received other taxable income, computed by the respondent by the bank deposit and cash expenditure method, by diverting *87 to themselves payments of accounts receivable of the corporation and other payments due the corporation from finance companies including payments upon discounting of notes and payments from dealer reserves; (3) whether they are entitled to deduct losses sustained in the operation of farms; and (4) whether they are liable for certain additions to tax, including additions to tax for fraud under section 293(b). Certain other issues have been disposed of by stipulations at the hearing, which will be referred to hereinafter. With respect to the corporate petitioner, the respondent conceded on brief that it is not liable for additions to tax under section 293(b) on account of fraud. The principal issues are whether the corporation had large amounts of unreported income as held by the respondent, and whether the respondent erred in disallowing deductions claimed for travel and entertainment expense. Findings of Fact Some of the facts are stipulated orally at the hearing, and such stipulations are incorporated herein by reference. The petitioners Hilton V. Carter and Gertrude Coxe were husband and wife during the years 1948 through 1952, residing in Baton Rouge, Louisiana. They filed *88 joint Federal income tax returns for those years with the collector or district director of internal revenue at New Orleans, upon the cash receipts and disbursements method of accounting. Hilton V. Carter similarly filed a separate return for 1953. The petitioners Gordon H. and Carrie Mae Brame are husband and wife, residing in Baton Rouge. They filed joint Federal income tax returns for the calendar years 1948 through 1953 with the collector or district director of internal revenue at New Orleans, upon the cash receipts and disbursements method of accounting. The wives are parties to this proceeding only by virtue of having filed joint returns. Hereinafter Hilton V. Carter and Gordon H. Brame will be referred to by their surnames or as the petitioners. The petitioners Brame & Carter, Inc., hereinafter referred to as the corporation, kept its books and filed its income tax returns on the basis of a fiscal year ending January 31, and upon an accrual method of accounting. It filed Federal income tax returns for the fiscal years ending January 31, 1949 through January 31, 1954, with the collector or district director of internal revenue at New Orleans. About 1937 Brame and Carter *89 became associated as partners and engaged in the business of selling Chrysler and Plymouth automobiles and parts. In 1942 the business was incorporated, the petitioner Brame & Carter, Inc. being created, with principal place of business at Baton Rouge. The corporation continued in the same type of business which also included buying and selling used cars. Each petitioner owned one-half of the stock of the corporation and they actively managed and had complete charge of the corporation. The investment in capital stock of the corporation is shown on its returns as being $10,000. Carter was its president and Brame was its vice-president. They devoted their full business time to the affairs of the corporation. The corporation employed a bookeeper and maintained books and records. However, these books were not accurate. They contained many errors and many items were not included therein. The inaccuracy of the books resulted, at least in part, from the manner in which the petitioners dealt with their corporation. The individual petitioners did not keep books. Carter had practically no records of his financial transactions in the years in question. Brame kept some invoices and cancelled *90 checks, but these were incomplete. Neither of the petitioners kept records which were adequate for the computation of taxable income. The corporation occupied and used two properties, one known as the Florida Street property and the other identified as the warehouse on North Leo or Beck Street. These properties were held in the name of Brame and Carter individually. No charge was made by them to the corporation for the use of these properties and the corporation did not pay them any rental. Brame and Carter as indiivduals from time to time borrowed money from the Fidelity National Bank. One account was carried on the books of the bank in their joint names, representing amounts which they had borrowed on notes which they had signed jointly and secured by their jointly owned property which was used by the corporation. Each of them individually also borrowed money on his individual note secured by his individually owned property, and the bank kept an individual account for each of them. The balances shown due by the bank records in each of these accounts was as follows: Brame &
G. H.
H. V.
Date
Carter
Brame
Carter
Jan. 31, 1947
$ 42,000.00
$ 1,000.00
Jan. 31, 1948
33,500.00
1,000.00
Jan. 31, 1949
23,000.00
3,000.00
Jan. 31, 1950
27,000.00
5,500.00
$ 3,000.00
Jan. 31, 1951
40,000.00
17,500.00
11,000.00
Jan. 31, 1952
60,800.00
10,500.00
7,000.00
Jan. 31, 1953
68,000.00
29,500.00
3,000.00
Jan. 31, 1954
105,000.00
62,700.00
*91 The amounts which the two individuals borrowed upon their joint notes were, with some possible exceptions, turned over by the individuals to the corporation for its use. During the corporation's fiscal years ended January 31, 1953, and January 31, 1954, some of the money borrowed by Brame individually from the bank was also turned over to the corporation for its use. The amounts so turned over to the corporation by the individuals jointly and by Brame individually were carried on the books of the corporation as notes payable to the bank. The corporation did not execute any notes to the bank for these amounts and did not furnish any collateral. However, during the years in question the corporation made regular payments in substantial amounts to the bank in repayment of the borrowed money which the corporation had received. The corporation carried on its books a personal account for each of the individual petitioners. At the direction of both Brame and Carter the corporation from time to time made miscellaneous payments on their personal obligations or for their personal benefit and these were charged to their personal accounts. From time to time various credits were also made to *92 these accounts. The corporation formally declared the following dividends to the individuals, which were reported by them as dividend income in their tax returns: Year
Brame
Carter
1948
$7,500.00
$7,500.00
1949
6,000.00
6,000.00
1950 *
2,600.00
2,600.00
1951 *
2,000.00
2,000.00
1952 *
2,500.00
2,500.00
1953*
2,000.00
2,000.00
When the corporation was formed in 1942 salaries were paid to Brame and Carter from which income taxes were withheld. However the payment of salaries was discontinued after a few years. Over the period from January 1, 1948 through January 31, 1953, the corporation paid no salaries, as such, to the individuals, although it did pay them monthly and weekly amounts as hereinafter set forth. In May of 1953 the corporation adopted a policy of once again paying salaries as such, at the rate of $750 per month to each individual, retroactive to February 1, 1953. Thereafter, commencing in June, monthly salary payments were so made and taxes were withheld. The corporation on its records treated the monthly payments which had theretofore been made from *93 January through May of 1953 at the rate of $600 per month as salary payments. Taxes were withheld by the corporation in the amounts of $1,383.80 in the case of Brame and $1,505.90 in the case of Carter. For the calendar year 1953, each individual reported salary payments from the corporation in the total amount of $8,250.00. Brame In his income tax returns for each of the years 1948 through 1953 the only income reported by Brame consisted of the above-mentioned formal dividends from the corporation and the above-mentioned salary from the corporation in 1953, plus the following: Year
Item
Amount
1948
An item "Miscellaneous Income"
$845.00
1950
Sale of livestock
420.00
Dividend from Fidelity National Bank
90.00
1951
Sale of livestock
564.00
1952
Recovery on note of A. P.
Tally
670.00
In the notices of deficiency the respondent determined that Brame had additional taxable dividends for the years 1948, 1949, and 1950, in the respective amounts of $13,300.26, $13,151.20, and $13,375.81. The respondent also determined the Brame had additional taxable income for the years 1948, 1949, and 1950, represented by unidentified bank deposits, in the *94 respective amounts of $33,147.10, $44,950.51, and $29,843.66. He also determined that Brame failed to return a longterm capital gain in the year 1949 in the amount of $4,820.80, and that he failed to return interest income in 1950 in the amount of $60. For each of the years 1948 and 1949 the respondent allowed Brame the standard deduction of $1,000 in lieu of the miscellaneous deductions claimed on his returns. In his petitions Brame made claim for farm loss deductions for the years 1948 through 1953 in the respective amounts of $9,291.61, $10,305.26, $13,686.49, $15,306.73, $11,909.97, and $14,002.53, which had not been claimed as deductions on his returns. In the notice of deficiency for the years 1951, 1952, and 1953 the respondent determined that Brame had additional unreported income of $20,887.18, $15,608.05, and $6,424.67, respectively. By amended answer the respondent alleged that he erroneously allowed farm losses for the years 1951, 1952, and 1953 in computing Brame's income and that Brame had taxable income for those years as follows: 1951
1952
1953
Understated receipts from Brame & Carter,
$16,421.55
$19,996.31
$14,012.91
Inc.
Other income reflected by bank deposits
17,505.51
7,772.14
4,174.83
and disbursements method
Unreported interest income
158.14
140.88
108.51
*95 At the hearing the parties stipulated that Brame had unreported interest income from third parties and on U.S. Savings Bonds for the years 1948 through 1953 in the respective amounts of $143.50, $103.28, $160.00, $158.14, $140.86, and $108.51; that he realized unreported long-term capital gains in the years 1948, 1949, 1950, and 1952 in the respective amounts of $546.63, $7,274.60, $375.00, and $49.60; that he realized unreported short-term capital gain of $125.00 in 1950; and that he received unreported compensation as an election commissioner in 1950 in the amount of $30.50. At the hearing the parties stipulated that Brame is entitled to miscellaneous deductions as follows: 1948
1949
1950
1951
1952
1953
Travel and
$ 75.00
entertainment
expenses
Interest
136.22
$ 919.95
$ 805.01
$1,387.54
$1,261.35
$2,111.02
Bank charges
53.39
69.77
8.85
85.02
115.38
169.37
Auto expenses
1,258.44
326.27
362.55
285.10
475.33
Taxes
269.75
162.94
208.61
481.54
La. state income
70.55
91.33
337.14
tax
Medical expenses
886.39
207.00
*
Donations
75.00
1,650.00
100.00
Dues and
100.00
subscriptions
Worthless stock
5.00
Total
$1,523.05
$2,542.68
$1,339.35
$2,439.60
3,983.60
$2,722.53
*96 Carter In his income tax returns for each of the years 1948 through 1953, the only income reported by Carter consisted of the above-mentioned dividends from the corporation and the above-mentioned salary from the corporation in 1953. In the notices of deficiency the respondent determined that Carter had additional taxable dividends for the years 1948, 1949, and 1950 in the respective amounts of $12,398.71, $13,064.39, and $13,738.23. The respondent also determined that Carter had additional taxable income for the years 1948 and 1950, represented by unidentified bank deposits, in the respective amounts of $7,327.29 and $11,354.32. He further determined that Carter had unreported additional taxable income in the years 1951, 1952, and 1953 in the respective amounts of $18,289.30, $29,773.11, and $5,596.39. He further determined that Carter had unreported gains from sales of capital assets in the years 1948, 1949, and 1950 in the respective amounts of $750, $5,200, and $5,994.39, and that he had unreported reported nterest income for the year 1950 in the amount of $33.91. The respondent allowed Carter *97 the standard deduction of $1,000 for each of the years 1948, 1949, and 1950 in lieu of itemized deductions claimed in his returns, and also allowed an additional deduction for 1949 of $1,000 on account of a mathematical error. In his petitions Carter made claim for deductions of farm losses for the years 1950 through 1953, in the respective amounts of $6,820.98, $14,538.71, $6,353.44, and $11,067.52, which had not been claimed on his returns. By amendment to his answer the respondent affirmatively alleged that the petitioner understated taxable dividends for the years 1948 and 1949 in the respective amounts of $13,486.91 and $17,788.36, that he failed to report other taxable income for 1948, represented by unidentified bank deposits in the amount of $25,462.24 and that he failed to report other taxable income for 1949, represented by unidentified bank deposits and expenditures, in the amount of $19,144.52. Therein he also alleged that Carter failed to report interest income for 1948 and 1949 in the respective amounts of $188.50 and $254.71. He also alleged that Carter failed to report taxable income for 1948 from the sale of real estate and other capital assets in the amount of $1,792.35. *98 By amended answers the respondent alleged that in computing Carter's taxable income for the years 1951, 1952, and 1953 he erroneously allowed farm losses. In his amended answer the respondent conceded that Carter was entitled to a net capital loss for 1953 in the amount of $1,000, which had not been claimed on his return. At the hearing the parties stipulated that Carter had unreported interest income from third parties and bank accounts for the years 1948 through 1953, in the respective amounts of $188.50, $254.71, $33.91, $90.75, $39.03, and $17.27; that he had unreported dividens from Baton Rouge Savings and Loan for the years 1949 and 1950, in the respective amounts of $292.50 and $195.00; and that he had unreported long-term capital gain of $3,584.70 in 1948 from the sale of 100 shares of stock and the sale of three lots. It was also stipulated that Carter did not realize in 1949 and 1950 gains from sales of residences, in the respective amounts of $5,200.00 and $5,994.39 as determined by the respondent in the notice of deficiency, and that Carter did not realize any deductible losses on such transactions. At the hearing the parties stipulated that Carter is entitled to miscellaneous *99 deductions as follows: 1948
1949
1950
1951
1952
1953
Interest
$ 244.71
$ 141.49
$ 104.17
$ 399.97
$ 256.41
$ 79.63
Taxes
328.35
393.32
213.06
531.25
407.00
573.35
Medical expenses
1,865.30
1,564.00
1,375.00
390.00
750.00
1,412.73
*
Miscellaneous
628.52
776.13
1,269.78
862.46
720.51
894.61
Contributions
200.00
Total
$3,066.88
$2,874.94
$2,962.01
$2,183.68
$2,133.92
$3,160.32
The Corporation The net income or loss shown by the corporation in its returns, and the net income determined by the respondent are as follows: Fiscal Year
Ending
Per Notice of
January 31
Per Return
Deficiency
1949
$63,140.93
$116,138.98
1950
44,382.73
99,455.10
1951
$41,367.94
$92,259.57
1952
8,507.56
23,298.33
1953
5,122.76
1954
(54,668.81)
In determining the deficiencies against the corporation, the respondent disallowed traveling and entertaining expenses claimed for the fiscal years ended January 31, 1949, 1950, and 1951, in the respective amounts of $11,075.00, $10,630.00, and $10,600.00. For *100 each of the fiscal years ended January 31, 1949 through January 31, 1952, the respondent determined that the corporation had unreported taxable income in the respective amounts of $41,923.05, $44,442.37, $40,291.63, and $14,790.77. At the hearing it was stipulated that the corporation incurred deductible legal expenses in its fiscal year ended January 31, 1952, in the amount of $600.00, which had not been claimed on its return. At the hearing it was also stipulated that the corporation had a net operating loss in its fiscal year ended January 31, 1954, in the amount of $36,229.80, instead of $54,668.81 as claimed in its return, which entitles the corporation to a net operating loss deduction in the fiscal year ended January 31, 1952, in the amount of $3,077.52. In its petition the corporation claims that the respondent failed to allow as a deduction in the fiscal year ended January 31, 1951, a discount charge of $2.50 on a loan to the petitioner by Brame and Carter. In its petition for the fiscal year ended January 31, 1952, the corporation claims that the respondent erred in not allowing a reasonable deduction for salary or compensation to Brame and Carter, and for rent for the *101 building occupied by it. The corporation's income tax returns show earned surplus and undivided profits as follows: Date
Amount
January 31, 1948
$ 68,577.95
January 31, 1949
93,032.09
January 31, 1950
104,562.83
January 31, 1951
124,037.80
January 31, 1952
129,955.97
January 31, 1953
129,637.60
January 31, 1954
74,639.76
Monthly Payments to Brame and Carter From 1948 until May 1953, the corporation made regular monthly payments to Brame and Carter. The amounts paid were at the rate of $550 per month to each over the period from January 1948 through February 1949; thereafter each was paid at the rate of $600 per month. The corporation ceased making these payments in May 1953, when it adopted the policy of paying salaries to its two officers as above described. The total face amount of monthly checks received in each year was as follows: 1948
1949
1950
1951
1952
1953
Brame
$6,600.00
$7,250.00
$6,600.00
$7,200.00
$7,200.00
$3,000.00
Carter
6,600.00
7,100.00
6,600.00
7,200.00
7,200.00
3,000.00
Brame and Carter deposited checks for monthly payments in each year as follows: 1948
1949
1950
1951
1952
1953
Brame
$6,600.00
$5,900.00
$6,000.00
$4,800.00
$5,400.00
$2,448.40
Carter
6,600.00
7,050.00
7,200.00
6,600.00
6,600.00
4,270.85
*102 No designation was made on the corporate records as to the character of these monthly payments. As they were made, corresponding debits were made in the personal accounts of the individuals on the books of the corporation. At January 1, 1948, the debit balances in the accounts of Brame and Carter were $8,255.55 and $8,279.35, respectively. Thereafter there were increases in such debit balances in each calendar year as follows 1948
1949
1950
1951
1952
1953
Brame
$8,100.26
$7,951.20
$5,575.81
$6,054.08
$6,562.80
($6,990.38)
Carter
7,598.71
7,864.39
5,638.23
3,743.43
7,060.14
( 1,294.13)
In Brame's account he was given credit in 1952 for a cash payment of $7,193.66 and in 1953 he was credited with a cash payment of $2,536.13 and a payment on corporate notes of $4,033.45. In Carter's account he was given credit in 1952 for a cash payment of $958.50. These accounts showed debit balances at January 31, 1954, for Brame and Carter in the respective amounts of $30,119.38 and $41,610.89. After the respondent began his investigation of the three petitioners they employed a certified public accountant, Hannis T. Bourgeois, to prepare audits *103 to establish their tax liabilities. Bourgeois did make complete audits and his audit reports formed the basis for the settlement of Louisiana State income taxes and also formed the basis for the later settlement in 1954 of the financial relations between the two individuals. Bourgeois continued to represent the three petitioners in these proceedings, filing some of the pleadings in each case. In the course of his work Bourgeois found that the corporate records were inadequate in that they contained errors and many omissions, and that the individuals did not keep books and records except for certain invoices and checks, which he found to be totally inadequate for the purpose of computing their taxable income. He reconstructed taxable income of the petitioners in part by specific items, but in the case of the two individuals he concluded that there were large amounts of unreported and unidentified income, requiring him to resort to the bank deposit and cash expenditures method of reconstructing income. In his calculations he also made net worth computations. He discussed his computations and adjustments with the petitioners. His audit reports were turned over to the attorney for the *104 petitioners who in turn made them available to the revenue agents pursuant to subpoena. In the course of his audits, Bourgeois examined the personal accounts of the two individuals carried on the books of the corporation and made adjustments therein. He increased the closing debit balances in these accounts as of January 31, 1954, by adding $24,101.86 to Brame's account, resulting in a closing debit balance of $54,221.24, and by adding $10,194.25 to Carter's account, resulting in a closing debit balance of $51,805.14. These adjustments were made because Bourgeois concluded that the individuals had collected and used for their own benefit certain accounts receivable and certain dealer reserve payments belonging to the corporation, as described infra. These revised debit balances formed the basis for the later settlement of the financial relations between the two individuals when Brame acquired Carter's stock. [2]
*105 In its income tax returns the corporation represented that the amounts due from officers and employees were as follows: Date
Amount
January 31, 1949
$ None
January 31, 1950
None
January 31, 1951
2,000.00
January 31, 1952
1,900.00
January 31, 1953
3,950.00
January 31, 1954
3,950.00
The corporation periodically furnished financial statements to the Chrysler Corporation (apparently on the representation that the business was conducted in partnership until December 31, 1952) showing among other things the balances in accounts for advances to officers and employees and capital accounts as follows: Capital Accounts
Advances to
Officers and
Drawing
Capital
Date
Employees
Investment
Account
Stock
Surplus
4/30/50
$ 800.00
$134,204.30
($ 1,765.81)
12/31/50
2,450.00
140,803.53
( 27,199.62)
12/31/51
1,900.00
153,370.15
( 26,773.46)
12/31/52
1,900.00
135,983.35
( 18,768.31)
3/31/54
1,900.00
105,416.44
8/31/54
50,935.57
$10,000.00
$58,850.96
Brame furnished personal financial statements to the Fidelity National Bank on October 4, 1951 and January 1, 1953 in which he showed the following: *106 Oct. 4, 1951
Jan. 1, 1953
Cash on hand and in banks
$ 1,000.00
$ 2,000.00
Government bonds
33,000.00
33,000.00
Various mortgage notes
12,500.00
10,500.00
Life insurance at cash surrender value
8,000.00
8,000.00
Stock in Chrysler Corporation
1,383.75
Real estate: 5000 Hyacinth Ave., 69 acres
50,000.00
100,000.00
1/2 interest in warehouse
10,000.00
1/2 interest in brick building
100,000.00
Cattle: 35 head
10,000.00
50 head registered Brahma and Herefords
10,000.00
Farm equipment
15,000.00
15,000.00
Automobiles
6,000.00
1/2 interest in Brame & Carter
100,000.00
64,972.33
Notes payable to banks
(29,500.00)
Mortgages on real estate
(23,150.00)
Current bills
(500.00)
Net worth
316,350.00
220,856.08
In his 1951 financial statement, Brame represented that his total income in 1950 was $20,000.00. Carter furnished financial statements to the Fidelity National Bank on May 27, 1949 and November 9, 1950 in which he showed the following: May 27, 1949
Nov. 9, 1950
Cash on hand and in banks
$ 8,000.00
$ 2,610.60
Baton Rouge Bldg. & Loan Assn.
13,000.00
Life insurance at cash surrender value
500.00
Automobiles and trucks
7,500.00
8,300.00
Horses: 6 head
21,000.00
15 head
15,000.00
Cattle: 1/2 interest in 75 head
7,500.00
100 head of grade cattle
12,200.00
One-half interest in Brame & Carter
72,104.00
76,201.87
Stock in Red Ball Concrete Inc.
8,500.00
Real estate: Greenville Springs Road, 15 acres
35,000.00
1/4 interest in estate
7,000.00
5,500.00
236 acres
60,000.00
Notes payable to banks
None
(11,000.00)
Current liabilities
(500.00)
Net worth
179,604.00
168,812.47
*107 The monthly payments to Brame and Carter for the years 1948 through 1952 constituted distributions by the corporation to them. The monthly payments of $600 per month paid to each individual during the months of January through May 1953, do not constitute distributions by the corporation but constitute salaries paid. Weekly Payments to Brame and Carter Throughout the years in question until July 3, 1953, the corporation paid Brame and Carter each $100 weekly, which was charged on the books of the corporation as travel and entertainment expense. Neither Brame nor Carter was required to account to the corporation for the use made of the weekly payments nor did they ever return any portion thereof to the corporation. Brame and Carter each received $5,200 in each of the years 1948 through 1952. In 1953 each received $2,450.00. Of these amounts Brame deposited in his bank account in each of the years 1948 through 1953 the respective amounts of $500, $400, $800, $1,400, $1,200, and $100. Of these amounts Carter deposited in his bank account in each of such years the respective amounts of $1,200, $800, $700, $1,100, $300, and $300. The following tabulation shows the amounts paid *108 by the corporation, including the weekly payments to the individuals, which were treated by the corporation as travel and entertainment expense and the amounts claimed as deductions by the corporation in its returns: Amount
Fiscal Year
Total
Deducted
Ending
Expended
in Return
Jan. 31, 1949
$11,075.00
$11,467.31
Jan. 31, 1950
10,630.00
11,384.68
Jan. 31, 1951
10,600.00
11,780.91
Jan. 31, 1952
10,400.00
10,918.65
Jan. 31, 1953
10,400.00
10,851.37
Jan. 31, 1954
4,100.00 The parties at the hearing orally stipulated that the amounts paid in excess of the weekly payments were travel expenses paid directly by the corporation. The amount stipulated for the year ended January 31, 1954, was $10,350.00, but this is clearly erroneous and we have included $10,400.00 for that year. All the weekly payments at the rate of $100 per week constituted salary payments to the individuals and constituted reasonable compensation. Accounts Receivable Throughout the years in question the books of account of the corporation contained numerous accounts receivable which had been paid by customers but which had not been recorded on the books as having been paid, *109 although a few bore a notation of having been paid. The corporation's bookkeeper, Anderson, in the course of his duties questioned Brame as to these accounts and Brame told him that some accounts had been collected but that the cash had not been routed through the corporate books. He advised Anderson that these accounts would be taken care of in due course of time. The bookkeeper accordingly segregated these accounts from the regular accounts receivable. On occasion some of such accounts were closed out at Brame's direction by charging them through the general journal to a special account in his name and the crediting accounts receivable. In April 1951, 32 accounts receivable amounting to $10,700.00 were so closed and charged to Brame's special account with no explanation on the books. As of January 31, 1954, there remained open on the books of the corporation accounts receivable which included accounts in the amount of $29,601.81 which had in fact been paid by the customers prior to December 31, 1953, (either by the payment of cash or by application in an allowance), but the payment of which, or the value of the car traded in, had not been recorded on the books of the corporation. *110 In May 1954, 12 accounts receivable amounting to $15,647.03 were closed out by a charge to Brame's special account with an explanation in the journal as follows: "Accounts receivable items collected and used by G. H. Brame". Of these 12 accounts, 6 totaling $8,905.09 had arisen and been paid prior to December 31, 1953. Included in these was an account of Eula Lipscomb in the amount of $2,178.50 which was paid by her check of July 22, 1955, and which was endorsed in the name of the corporation by Brame and was cashed by him. The revenue agent in his report took the position that the full amount of accounts receivable of $29,601.81 referred to above as having been open on the books at December 31, 1953, but which had been paid, constituted payments received by Brame and Carter. The accountant Bourgeois in his audit reports determined that Brame and Carter had income from the collection of accounts receivable over the years 1948 through 1953 in the amount of $15,874.04. Brame and Carter admitted to him that they had collected accounts receivable which had not been recorded on the books of the corporation. He attempted to have the individuals identify the disposition of the payments *111 of each account, but the, were not able to do so in each instance. In such instances he charged each equally with the payment. Each of the individuals was aware of Bourgeois' allocation and neither expressed any objection thereto. These amounts, at least in part, were later charged to their personal accounts, and the later settlement of the financial relations of the two individuals, as well as the Louisiana state income tax, was based upon Bourgeois' audits, including these allocations. The amounts received by Brame and Carter from collections of accounts receivable as found by the revenue agent and by Bourgeois are as follows: Per Reve-
Per Bour-
nue Agent
geois
Year 1948
Brame
$ 688.19
$ 1,237.26
Carter
688.29
1,237.26
Year 1949
Brame
$ 4,023.19
2,596.00
Carter
3,933.44
2,596.00
Year 1950
Brame
2,275.00
502.50
Carter
950.00
502.50
Year 1951
Brame
1,795.38
1,110.26
Carter
1,438.26
1,110.26
Year 1952
Brame
4,523.79
1,423.39
Carter
1,335.43
274.10
Year 1953
Brame
7,426.48
1,704.81
Carter
524.46
1,679.80
Grand Total
$29,601.81
$15,974.14
Brame and Carter received payment of accounts receivable *112 of the corporation for their own use and benefit in at least the following amounts: 1948
1949
1950
1951
1952
1953
Brame
$1,237.26
$2,596.00
$502.50
$1,110.26
$1,423.39
$1,704.81
Carter
1,237.26
2,596.00
502.50
1,110.26
274.10
1,679.80 These amounts constituted distributions by the corporation to Brame and Carter. Dealer Reserves In selling automobiles the corporation received from purchasers of cars notes for installment payments, secured by chattel mortgages, representing the unpaid balance of the purchase price of the cars. It would then discount such notes with finance companies which would issue checks payable to the corporation in the amount of the discounted figure, less, however, some portion retained by the finance company and set aside in a reserve account, generally known as a dealer's reserve, to protect the finance company against losses on the transactions. The amount required by the finance companies to be retained in the dealer's reserve was a specified percentage of the outstanding notes purchased. When the balance in the reserve account exceeded such fixed percentage it was the normal practice of the finance *113 companies to pay the excess to the dealer by check. The corporation in the years in question dealt principally with Commercial Credit Corporation and Universal CIT Credit Corporation. On occasions E. A. Harrell, a car salesman employed by the corporation, would be asked by either Brame or Carter to go to the bank and cash checks which had been received and which were payable to the corporation. Either Brame or Carter would endorse the check in the name of the corporation and Harrell would then place his endorsement thereon and cash the check, returning the cash to whichever of the individuals had given him the check. Fred Eubanks was another car salesman who similarly cashed checks given him by Brame. Commercial Credit Corporation made the following payments out of the dealer's reserve account maintained for the corporation: Date of
Payment
Amount
1949
Feb. 4
$ 705.47
Sept. 26
500.00
$1,205.47
1950
Sept. 28
290.12
Nov. 27
1,020.61
1,310.73
1951
Jan. 31
$ 272.99
Feb. 27
674.35
Apr. 24
705.23
July 31
919.00
Aug. 29
1,500.00
Nov. 14
195.00
Nov. 29
2,000.00
Dec. 21
158.00
Dec. 21
319.60
$6,744.17
1952
Jan. 24
167.61
Mar. 26
214.00
Apr. 16
559.35
Apr. 16
238.42
May 29
225.38
Aug. 13
3,000.00
Sept. 29
692.24
Oct. 31
978.92
Nov. 12
217.14
6,293.06
1953
Feb. 13
1,200.00
Feb. 28
1,400.00
May 26
1,235.99
July 31
568.18
Aug. 29
1,828.71
Sept. 30
938.48
7,171.36
*114 All the above payments are shown on the records of Commercial Credit Corporation. The payments of February 27, August 29, and November 29, 1951, August 13, 1952, and February 28, 1953, aggregating $8,574.35, were evidenced by checks drawn in favor of the corporation and endorsed in the name of the corporation by Brame. The one dated February 28, 1953, in the amount of $1,400.00, also contains the endorsement of E. A. Harrell. All of them except the one dated February 28, 1953, bear a stamp indicating that they were cashed. Brame received the. cash in each instance. All the remaining payments, except those in 1949, are evidenced by checks drawn in favor of the corporation, endorsed in the name of the corporation by Brame, and bear the endorsement of the Commercial Credit Corporation for deposit to its credit in the City National Bank in Baton Rouge. On May 22, 1953, Universal CIT Credit Corporation issued a check payable to the corporation in the amount of $452.09, representing a payment from the dealer's reserve account maintained by it for the corporation. This check was endorsed in the name of the corporation by Brame. This check bears a stamp showing that the bank paid out *115 cash for this check. Brame received the cash represented by this check. The corporation did not receive any of the above payments from Commercial Credit Corporation nor were any of these payments recorded on its books. (The only payment recorded on the corporate books during this period as a payment from a dealer reserve account was $1,000, the source of which is not shown, which the corporation reported in its return for the fiscal year ended January 31, 1950.) While Brame initially received the cash represented by the above described checks of Commercial Credit Corporation and Universal CIT Corporation, Carter received one-half of such amounts. He and Carter also received equally the 1949 payments from Commercial Credit Corporation which are not evidenced by checks submitted in evidence. The amounts so received by the individuals constituted distributions to them by the corporation. Bourgeois in preparing the audit reports fixing the amount of income of the two individuals resulting from payments from dealer reserve accounts treated such payments as having been received equally by Brame and Carter and reflected them, at least in part, by later charges to their personal accounts. *116 The individual petitioners accepted his allocation of these amounts and did not advise him of any obligations of the corporation which had been paid with these funds. His audit reports, including these adjustments, formed the basis for the settlement of both the state tax liabilities and the financial relations of the two individuals when Brame acquired Carter's stock and ceased to be connected with the corporation in 1954. The following tabulation shows the amounts of dealer reserve payments received by Brame and Carter as found above, the amounts which Bourgeois included in his audit reports, and the amounts computed by the revenue agent. As included in
As com-
Bourgeois
puted by
As found
Audit Re-
Revenue
herein
ports
Agent
Year 1949
Brame
$ 602.74
$ 498.04
$ 498.04
Carter
602.73
498.03
498.03
Year 1950
Brame
655.37
740.57
740.57
Carter
655.36
740.56
740.56
Year 1951
Brame
3,372.08
3,372.09
3,372.09
Carter
3,372.08
3,372.08
3,372.08
Year 1952
Brame
$3,146.53
$ 3,372.58
$ 3,372.58
Carter
3,146.53
3,372.57
3,372.58
Year 1953
Brame
3,811.72
4,136.43
4,136.43
Carter
3,811.72
4,136.42
4,136.42
Grand Total
$23,175.86
$24,239.37
$24,239.38
*117 The net increases in the credit balance of the dealers reserve account maintained by Commercial Credit Corporation for the corporation were as follows: During fiscal year ended
Net Increase
January 31, 1949
$ 934.58
January 31, 1950
1,121.43
January 31, 1951
2,741.01
January 31, 1952
1,333.70
The above net increases take into account payments made by Commercial Credit Corporation to Brame and Carter (as described above) as follows: During fiscal year ended
Amount
January 31, 1950
$1,205.47
January 31, 1951
1,583.72
January 31, 1952
6,638.79 Accordingly, the total amounts retained by Commercial Credit Corporation on notes discounted in the corporation's fiscal years here in question and credited to the corporation were as follows: During fiscal year ended
Amount
January 31, 1949
$ 934.58
January 31, 1950
2,326.90
January 31, 1951
4,324.73
January 31, 1952
7,972.49
None of the above amounts had been entered on the books of the corporation and tax was not paid thereon. These amounts constituted accrued income to the corporation in the respective fiscal years. Other Payments by Finance Companies Upon the *118 sale of an automobile on the installment basis the note given by the customer for the unpaid purchase price also included amounts representing finance charges and insurance upon the car. The finance company would issue a check payable to the corporation in the amount of the discounted figure, less a portion retained and set aside in the reserve account. On some occasions the insurance would not be purchased by the finance company but would be purchased through some other insurance company. In some such cases the finance company would issue a check to the corporation specifically for the purpose of purchasing such insurance. Also when a purchaser paid up his obligation to the finance company in advance of the time prescribed in the note he would be entitled to a refund of some part of the finance charges and insurance. Sometimes these refunds were made the subject of checks drawn by the finance company in favor of the corporation for the purpose of making the refund to the purchaser. Also, the finance companies would occasionally draw checks in small amounts in favor of the corporation for the purpose of adjusting certain errors in individual accounts. In the years in question many *119 checks drawn by Commercial Credit Corporation and Universal CIT Credit Corporation in favor of the corporation were never deposited in the corporation's bank account, but, rather, were received by Brame or Carter and either cashed or negotiated by them. In 1950 Commercial Credit Corporation issued 18 checks totaling $7,936.25 payable to the corporation, which were not deposited in the bank account of the corporation but were endorsed in the name of the corporation by Brame. All bear a notation showing that they were cashed and nine of them totaling $4,009.32 bear the additional endorsement of E. A. Harrell. These checks were all cashed by Brame and are as follows: Date
Amount
Aug. 18, 1950
$ 488.00
Aug. 24, 1950
12.80
Aug. 28, 1950
370.00
Sept. 5, 1950
2,310.00
Sept. 5, 1950
33.17
Sept. 5, 1950
36.37
Sept. 6, 1950
132.00
Oct. 19, 1950
814.82
Oct. 26, 1950
26.79
Nov. 2, 1950
340.00
Nov. 22, 1950
175.80
Dec. 4, 1950
9.20
Dec. 7, 1950
17.30
Dec. 11, 1950
260.00
Dec. 15, 1950
1,005.00
Dec. 18, 1950
385.00
Dec. 18, 1950
660.00
Dec. 29, 1950
860.00
Total
$7,936.25
In 1951 Commercial Credit Corporation issued 57 checks totaling $29,382.25 *120 payable to the corporation which were not deposited in the bank account of the corporation, but were endorsed in the name of the corporation by Brame. Fifty-four of these checks totaling $27,052.25 bear bank stamps showing that they were cashed, 16 of these totaling $5,867.71 also bearing the endorsement of E. A. Harrell or Fred Eubanks. Of the three remaining checks, two, namely, check of August 24, 1950, in the amount of $1,440 and check of September 25, 1950, in the amount of $740.00, were deposited in Brame's personal account in the Fidelity National Bank. The list of checks is as follows: Date
Amount
Date
Amount
Jan. 8
$ 1,477.00
June 4
$ 205.00
Jan. 3
1,310.00
June 11
205.00
Jan. 16
510.00
June 18
960.00
Jan. 19
158.42
June 18
140.00
Jan. 23
178.13
June 25
110.00
Jan. 23
204.23
June 25
230.00
Feb. 3
150.00
June 28
240.00
Feb. 7
803.00
July 2
940.00
Feb. 9
270.00
July 2
145.00
Feb. 28
650.00
July 9
260.00
Mar. 8
366.00
July 10
435.00
Mar. 9
650.00
July 10
560.80
Mar. 12
244.56
Aug. 3
198.27
Mar. 12
39.37
Aug. 20
673.00
Apr. 2
335.00
Aug. 24
1,440.00
Apr. 5
510.00
Sept. 17
960.00
Apr. 12
60.74
Sept. 25
740.00
Apr. 13
1,967.03
Sept. 27
207.00
Apr. 19
1,152.00
Sept. 28
1,473.00
Apr. 30
824.00
Oct. 8
200.00
May 3
940.00
Oct. 10
250.00
May 3
260.00
Oct. 22
340.00
May 3
205.00
Oct. 23
210.00
May 7
390.00
Oct. 23
805.00
May 7
525.00
Oct. 31
11.70
May 14
520.00
Nov. 27
870.00
May 14
630.00
Dec. 4
5.00
May 29
814.00
Dec. 13
85.00
June 4
340.00
Total
$29,382.25
*121 In 1952 Commercial Credit Corporation issued 40 checks totaling $33,509.20 payable to the corporation which were not deposited in the corporation's bank account but were endorsed in the name of the corporation by Brame. Thirty-seven of these checks totaling $31,178.89 bear bank stamps showing that they were cashed. Six of these totaling $3,522.41 also bear the endorsement of E. A. Harrell or Fred Eubanks. Of the remaining three checks, one of them, namely, check of December 15, 1952, in the amount of $760.00, was deposited in Brame's personal bank account. The list of checks is as follows: Date
Amount
Date
Amount
Jan. 14
$ 260.00
June 23
$ 1,010.00
Feb. 6
1,760.00
June 26
25.00
Feb. 18
840.00
July 23
140.00
Mar. 6
25.31
July 29
205.00
Mar. 6
1,140.00
July 31
1,505.00
Mar. 12
110.00
Aug. 7
11.50
Mar. 12
1,110.00
Aug. 19
2,810.00
Apr. 7
205.00
Aug. 21
740.00
Apr. 12
870.00
Sept. 15
16.83
Apr. 16
1,545.00
Sept. 15
17.28
Apr. 21
1,411.79
Sept. 15
5.14
Apr. 21
670.00
Oct. 2
1,710.00
Apr. 22
255.00
Oct. 25
21.43
Apr. 23
34.58
Oct. 27
289.00
Apr. 25
526.00
Nov. 14
308.30
May 5
210.00
Nov. 14
12.37
May 7
9,695.37
Nov. 14
41.89
May 10
140.00
Dec. 15
760.00
May 10
90.00
Dec. 15
810.00
May 27
1,700.00
Dec. 23
472.41
Total
$33,509.20
*122 In 1953 Commercial Credit Corporation issued five checks totaling $4,409.36 payable to the corporation and endorsed by Brame which were not deposited in the bank account of the corporation. Each of these checks bears a bank stamp showing that it was cashed. The list of checks is as follows: Date
Amount
Jan. 23
$ 14.87
Feb. 6
1,782.49
Feb. 6
1,417.00
Apr. 13
660.00
May 15
535.00
$4,409.36
On January 5, 1951, Commercial Credit Corporation also issued two checks in favor of the corporation, one in the amount of $105 and one in the amount of $870. Both were endorsed by Carter and each bears a bank stamp showing that it was cashed. On August 4, 1953, Universal CIT Credit Corporation issued a check in the amount of $2,335.93 in favor of the corporation, representing payment on a discounted note. This check was endorsed by Brame and bears a bank stamp showing that it was cashed. Computation of Unreported Income by Bank Deposit and Cash Expenditures Method Since the individual petitioners did not keep records from which taxable receipts could be determined and since for the years 1948 and 1949 records of Commercial Credit Corporation were not available *123 the agents resorted to the bank deposit and cash expenditures method to determine whether the individual petitioners had received unidentified income not reported by them, particularly from the diversion to themselves of proceeds of finance company checks payable to the corporation. The revenue agents made a through examination of the deposits made to the bank accounts of each of the individual petitioners in each of the years in question. Some of the deposits were by check and some were in cash. The respondent properly computed Brame's unidentified deposits, both cash and check, with minor exceptions. The proper calculation of Brame's unidentified deposits, embodying corrections shown to be necessary by the record, is as follows: 1948
1949
1950
Total bank deposits
$50,572.17
$105,140.51
$38,465.99
Less: Identified deposits: Dividends
7,507.50
6,000.00
Weekly payments
500.00
400.00
800.00
Monthly payments
6,600.00
5,900.00
6,000.00
Sale of used cars
2,318.00
850.00
Misc. deposits (sales of assets, etc.)
1,419.79
12,170.00
1,305.00 **
Notes discounted ***
923.50
6,643.12
Interest income
20.00
3.28
60.00
A. P. Tally note recovery included in
return
Misc. nontaxable receipts ****
5,101.79
21,378.45
2,844.52
Total identified deposit
$24,390.58
$ 52,494.85
$11,859.52
Unidentified deposits: Cash
23,950.00
41,336.36
20,215.00
Checks
2,231.59
11,259.30
6,391.47
Total
$26,181.59
$ 52,595.66
$26,606.47
*124 1951
1952
1953
Total bank deposits
$36,568.32
$53,970.91
$41,883.88
Less: Identified deposits: Dividends
Weekly payments
1,400.00
1,200.00
100.00
Monthly payments
4,800.00
5,400.00
2,448.40 *
Sale of used cars
Misc. deposits (sales of assets, etc.)
Notes discounted ***
1,291.42
925.00
Interest income
58.14
40.88
A. P. Tally note recovery included in
670.00
return
Misc. nontaxable receipts ****
300.00
11,046.33
19,945.65
Total identified deposit
$ 7,849.56
$19,282.21
$22,494.05
Unidentified deposits: Cash
18,392.00
24,745.00
19,389.83
Checks
10,326.76
9,943.70
Total
$28,718.76
$34,688.70
$19,389.83
*125 The respondent's agent also made an analysis of all expenditures made by Brame during the years in question and segregated those which were made by cash, as distinguished from checks. The respondent's computation of Brame's unidentified taxable income is summarized as follows: 1948
1949
1950
Expenditures of Cash: *
Cash bank deposits
$23,950.00
$41,336.36
$20,215.00
Unidentified
2,231.59
11,259.30
6,391.47
Estimated cash personal expenditures
1,200.00
1,200.00
1,200.00
Misc. cash expenditures
5,136.94
11,844.14
3,774.78
Total unidentified deposits and cash
$32,518.53
$65,639.80
$31,581.25
expenditures to be accounted for
Less: Available nonincome cash **
2,042.28
37,877.60
18,663.74
Less: Identified cash income: Income through drawings
$ 7.75
Weekly checks cashed
4,700.00
$ 4,800.00
$ 5,000.00
Monthly checks cashed
1,350.00
Salary
Accounts Receivable
688.19
4,023.19
2,275.00
Dealer Reserve payments cashed
498.04
740.57
Sale of assets
2,175.00
7,500.00
375.00
Interest
100.00
100.00
100.00
Total
$ 9,713.22
$56,148.83
$27,154.31
Unidentified deposits and cash expended
$22,805.31
$ 9,490.97
$ 4,426.94
(Unidentified income)
*126 1951
1952
1953
Expenditures of Cash: *
Cash bank deposits
$18,392.00
$24,745.00
$19,389.83
Unidentified
10,326.76
11,633.70
Estimated cash personal expenditures
1,200.00
1,200.00
1,200.00
Misc. cash expenditures
12,016.65
23,105.74
32,643.01
Total unidentified deposits and cash
$41,935.41
60,684.44
$53,232.84
expenditures to be accounted for
Less: Available nonincome cash **
12,398.43
38,355.93
29,248.39
Less: Identified cash income: Income through drawings
Weekly checks cashed
$ 6,200.00
$ 4,000.00
$ 2,450.00
Monthly checks cashed
Salary
4,363.20
Accounts Receivable
1,795.38
4,523.79
7,426.48
Dealer Reserve payments cashed
3,372.09
3,372.58
4,136.43
Sale of assets
564.00
2,560.00
1,325.00
Interest
100.00
100.00
108.51
Total
$24,429.90
$52,912.30
$49,058.01
Unidentified deposits and cash expended
$17,505.51
$ 7,772.14
$ 4,174.83
(Unidentified income)
*127 The proper computation of Brame's unidentified deposits and cash expedicures (unidentified income), giving effect to all adjustments required by the record and our findings and holdings herein, is as follows: 1948
1949
1950
Expenditures of cash: Cash bank deposits
$23,950.00
$41,336.36
$20,215.00
Unidentified deposits (checks)
2,231.59
11,259.30
6,391.47
Estimated cash personal expenditures
1,200.00
1,200.00
1,200.00
Miscellaneous cash expenditures
5,136.94
11,844.14
3,774.78
Total unidentified deposits and cash
$32,518.53
$65,639.80
$31,581.25
expenditures to be accounted for
Less: Available nonincome cash
2,042.28
37,877.60
18,663.74
Less: Cash on hand
2,500.00 [1]
Less: Identified income and cash
receipts: Dividends
2,690.00 [3]
Income through drawing account
7.75
Weekly checks
4,700.00
4,800.00
4,400.00
Monthly checks
1,350.00
600.00
Salary
Item on return "Miscellaneous Income"
845.00
Accounts receivable collected
1,237.26
2,596.00
502.50
Dealer reserve payments cashed
602.74
655.37
Sale of assets
2,175.00
7,500.00
795.00 [4]
Interest
123.50
100.00
100.00
Total
$13,630.79
$54,826.34
$28,406.61
Unidentified deposits and cash expended
18,887.74
10,813.46
3,174.64
(unidentified income)
*128 1951
1952
1953
Expenditures of cash: Cash bank deposits
$18,392.00
$24,745.00
$19,389.83
Unidentified deposits (checks)
10,326.76
9,943.70
Estimated cash personal expenditures
1,200.00
1,200.00
1,200.00
Miscellaneous cash expenditures
12,016.65
23,105.74
32,643.01
Total unidentified deposits and cash
$41,935.41
$58,994.44
$53,232.84
expenditures to be accounted for
Less: Available nonincome cash
12,398.43
38,355.93
29,249.39
Less: Cash on hand
2,988.05 [2]
Less: Identified income and cash
receipts: Dividends
2,000.00
2,500.00
2,000.00
Income through drawing account
Weekly checks
3,800.00
4,000.00
2,350.00
Monthly checks
2,400.00
1,800.00
Salary
4,417.80
Item on return "Miscellaneous Income"
Accounts receivable collected
1,110.26
1,423.39
1,704.81
Dealer reserve payments cashed
3,372.08
3,146.53
3,811.72
Sale of assets
564.00
2,560.00
1,325.00
Interest
100.00
99.98
108.51
Total
$25,744.77
$53,885.83
$47,954.28
Unidentified deposits and cash expended
16,190.64
5,108.61
5,278.56
(unidentified income)
*129 The respondent properly computed Carter's unidentified deposits with a minor exception. The corrected calculation is as follows: 1948
1949
1950
Total bank deposits
$29,181.84
$37,534.99
$54,158.75
Less: Identified deposits: Dividends
7,500.00
3,500.00
Weekly payments
1,200.00
800.00
700.00
Monthly payments
6,600.00
7,050.00
7,200.00
Interest income
49.74
65.00
33.91
Sales of assets
8,623.74
6,903.54
3,187.87
Miscellaneous nontaxable receipts [2]
3,058.36
6,980.87
35,642.32
Dividend from Baton Rouge Bldg. & Loan
150.00
Assn.
Adjustment [3]
1,744.65
Total identified deposits
$27,031.84
$25,299.41
$48,658.75
Unidentified deposits: Cash
$ 1,400.00
$10,927.32
$ 5,500.00
Checks
750.00
1,308.26
Total
$ 2,150.00
$12,235.58
$ 5,500.00
1951
1952
1953
Total bank deposits
$19,206.55
$18,402.09
$22,391.86
Less: Identified deposits: Dividends
Weekly payments
1,100.00
300.00
300.00
Monthly payments
6,600.00
6,600.00
4,270.85 [1]
Interest income
23.46
39.03
17.27
Sales of assets
1,041.54
1,056.73
Miscellaneous nontaxable receipts [2]
650.83
5,193.31
15,340.04
Dividend from Baton Rouge Bldg. & Loan
Assn.
Adjustment [3]
Total identified deposits
$ 9,415.83
$13,189.07
$19,928.16
Unidentified deposits: Cash
$ 8,253.96
$ 1,150.00
$ 2,463.70
Checks
1,536.76
4,063.02
Total
$ 9,790.72
$ 5,213.02
$ 2,463.70
*130 The respondent's agent also made an analysis of all expenditures made by Carter during the years in question and segregated those which were made by cash as distinguished from checks. The respondent's computation of Carter's unidentified taxable income is summarized as follows: 1948
1949
1950
Expenditures of cash: [1]
Cash bank deposits
$ 2,675.00
$10,927.32
$ 5,500.00
Unidentified deposits
750.00
1,008.24
Estimated cash personal expenditures
1,800.00
1,800.00
1,800.00
Miscellaneous cash expenditures
27,976.54
48,130.70
46,675.55
Total unidentified deposits and cash
$36,201.44
$61,866.26
$53,975.55
expenditures to be accounted for
Less: Available nonincome cash [3]
4,366.00
1,224.00
Less: Identified cash income: Dividends [4]
2,792.50
45.00
Income through drawing account
50.00
435.92
Weekly checks cashed
4,000.00
4,400.00
4,500.00
Accounts receivable
688.20
3,933.44
950.00
Dealers reserve payments cashed
498.03
740.56
Sale of assets
1,685.00
25,600.00
35,700.00
Interest
Collection on note
5,447.77
Prize money received
Total
$10,739.20
$42,721.74
$43,595.48
Unidentified deposits and cash expended
$25,462.24
$19,144.52
$10,380.07
(unidentified income)
*131 1951
1952
1953
Expenditures of cash: [1]
Cash bank deposits
$ 8,252.90 [2]
$ 1,150.00
$ 2,463.70
Unidentified deposits
1,536.76
4,063.02
Estimated cash personal expenditures
1,800.00
1,800.00
1,800.00
Miscellaneous cash expenditures
19,407.66
43,022.21
32,810.30
Total unidentified deposits and cash
$30,997.32
$50,035.23
$37,074.00
expenditures to be accounted for
Less: Available nonincome cash [3]
3,280.13
8,919.01
19,953.50
Less: Identified cash income: Dividends [4]
Income through drawing account
Weekly checks cashed
4,100.00
4,900.00
2,150.00
Accounts receivable
1,438.26
1,335.43
524.46
Dealers reserve payments cashed
3,372.08
3,372.57
4,136.42
Sale of assets
2,696.67
15,612.99
2,082.11
Interest
66.23
Collection on note
Prize money received
352.50
Total
$14,953.37
$34,492.50
$28,846.49
Unidentified deposits and cash expended
$16,043.95
$15,542.73
$ 8,227.51
(unidentified income)
*132 The proper computation of Carter's unidentified deposits and cash expenditures (unidentified income), giving effect to all adjustments required by the record and our findings and holdings herein, is as follows: 1948
1949
1950
Expenditures of cash: Cash bank deposits
$ 1,400.00
$10,927.32
$ 5,500.00
Unidentified deposits (checks)
750.00
1,308.26
Estimated cash personal expenditures
1,800.00
1,800.00
1,800.00
Miscellaneous cash expenditures
30,976.44
47,830.68
46,675.55
Total unidentified deposits and cash
$34,926.44
$61,866.26
$53,975.55
expenditures to be accounted for
Less: Available nonincome cash
4,366.00
1,224.00
Less: Cash on hand *
3,000.00
Less: Identified income and cash
receipts: Dividends
2,792.50
2,645.00
Income through drawing account
50.00
435.92
Weekly checks
4,000.00
4,400.00
4,500.00
Monthly checks
50.00
Salary
Accounts receivable collected
1,237.26
2,596.00
502.50
Dealer reserve payments cashed
602.73
655.36
Sale of assets
1,685.00
25,600.00
35,700.00
Interest
138.76
187.11
Collection on note
5,447.77
Prize money received
Total
$14,427.02
$41,726.11
$45,662.78
Unidentified deposits and cash expended
$20,499.42
$20,140.15
$ 8,312.77
(unidentified income)
*133 1951
1952
1953
Expenditures of cash: Cash bank deposits
$ 8,252.90
$ 1,150.00
$ 2,463.70
Unidentified deposits (checks)
1,536.76
4,063.02
Estimated cash personal expenditures
1,800.00
1,800.00
1,800.00
Miscellaneous cash expenditures
19,407.66
43,022.21
32,810.30
Total unidentified deposits and cash
$30,997.32
$50,035.23
$37,074.00
expenditures to be accounted for
Less: Available nonincome cash
3,280.13
8,919.01
19,953.50
Less: Cash on hand *
Less: Identified income and cash
receipts: Dividends
2,000.00
2,500.00
2,000.00
Income through drawing account
Weekly checks
4,100.00
4,900.00
2,150.00
Monthly checks
600.00
Salary
2,473.25
Accounts receivable collected
1,110.26
274.10
1,679.80
Dealer reserve payments cashed
3,372.08
3,146.53
3,811.72
Sale of assets
32,696.67
15,612.99
2,082.11
Interest
67.29
Collection on note
Prize money received
332.50
Total
$16,626.43
36,305.13
$34,150.38
Unidentified deposits and cash expended
$14,370.89
$13,730.10
$ 2,923.62
(unidentified income)
[Farms] Brame: Prior to 1945 Brame had owned a farm consisting *134 of 153 acres, which he sold at a date not disclosed. In 1945 he purchased 68 1/2 acres of swamp and woodland located on the outskirts of Baton Rouge. In 1946 he had the land cleared, built a road, and constructed a dam for the purpose of creating a lake. He also fenced the property and built a barn. Improvements of this nature continued to be made through the year 1953. In 1949 he built his residence on this property. Prior thereto he had lived about two miles away. Brame improved the pasture land on this property and raised ten acres of corn for feed. He owned Tennessee walking horses. These are show horses the value of which is primarily dependent upon the success gained at horse shows. A riding ring is necessary to the training of horses of this type. By the end of 1953 Brame had some horses which he had been training, but in none of the years in question did he have any fully developed or trained horses. He sold no trained horses in the years 1948 to 1953. He purchased one horse in 1949 for $2,750 and sold a colt in 1952 for $2,250 and a horse in 1953 for $1,325. In 1948 and 1949 he received $135 and $270, respectively, for boarding a horse or horses. Brame also kept registered *135 Brahma and Hereford cattle and some grade cows. He sold cattle in 1948 and 1951 receiving $609.79 and $564.00, respectively. In 1949 he also sold two Jersey cows for $400.00. He also maintained on this place wild ducks, pheasant, peacocks, geese, turkeys, chickens, and dogs. Brame did not maintain any books or records with respect to his farming operations. The only income reported by Brame on his returns for any of the years in question which pertained to any farming operations was $420 and $564 in the years 1950 and 1951, respectively. In none of the years in question did he claim in his income tax returns any deductions on account of farm operations. It was stipulated that Brame's farm expenditures were as follows: 1948
1949
1950
$8,680.76
$10,265.77
$13,146.48
1951
1952
1953
$15,439.28
$14,305.14
$14,827.51
It was also stipulated that Brame's gross profit from farm operations before deduction of the above stipulated expenditures was as follows: 1948
1949
1950
1951
1952
1953
$26.79
$245.00
$225.00
($36.00)
$2,250.00
$975.00
The respondent in arriving at Brame's taxable income as shown in the notice of deficiency *136 allowed farm losses in the years 1951, 1952, and 1953 in the respective amounts of $11,015.46, $8,478.85, and $10,145.63, although these amounts were not specifically set forth in such notice of deficiency. Brame did not conduct farming operations with the intention of making a profit and such operations did not constitute the conduct of a trade or business. Carter: Prior to 1948 Carter owned Tennessee walking horses which he boarded in Tennessee. During 1948 he lived in Baton Rouge, where he had a lot and small stable. In the latter part of 1948 he bought and moved to a farm near Baton Rouge consisting of 15 acres, known as Lone Oak, on Greenville Springs Road. At that time the property was not in condition to maintain farming operations. He made additions to the house, built a riding ring, a barn, and fences and had a pond dug. He planted about 5 acres of corn. He brought his Tennessee walking horses from Tennessee to this farm. Carter kept this property until 1950 when he sold it for $35,700 cash and purchased approximately 236 acres of land known as the Manchac Plantation for $34,000 in cash, which he shortly thereafter made his personal home. At that time he acquired 200 to *137 300 head of beef cattle consisting of registered bulls and grade cows. He continued to maintain horses. He at that time also acquired additional farm implements, built several new barns, and made considerable other improvements on the plantation. In connection with his horses Carter employed trainers, grooms, a stable man and a horse shoer. His horses were sometimes entered in horse shows. In 1949 Carter purchased 5 horses at costs ranging from $2,000 to $10,000, totaling $23,500. In the same year he sold two of the same horses for a total of $15,020. In 1950 he purchased a horse for $2,000 and cattle for $6,800. In that year he sold hay for $195 and cattle for $2,172.87. In 1951 he purchased a horse for $250, 3 bulls for $1,315, and cattle for $1,600. In that year he had sales of cattle totaling $2,073.21 and horses for $1,665. In 1952 he sold cattle for $1,219.72 and some show horses for $15,450. In 1953 he sold cattle for $2,082.11. Carter did not maintain books and records of his farm operations and made no annual computation of his farm income and losses, although he knew he was losing money. In none of his returns for the years 1948 through 1953 did Carter report any income *138 from farm operations, nor did he claim any deductions on account of farm expenditures. It was stipulated that Carter's farm expenditures were as follows: 1949
1950
1951
1952
1953
$12,202.14
$8,038.85
$14,661.92
$16,408.62
$13,149.63
No analysis was ever made of the farm operation separating the transactions related to horses and those related to cattle and the petitioner could not determine what portion of the stipulated expenditures are attributable to cattle and what portion to horses. It was also stipulated that Carter's gross profit from farm operations before deduction of the above stipulated expenditures was as follows: 1949
1950
1951
1952
1953
$3,020.00
$1,217.87
$123.21
$10,127.22
$2,082.11
The respondent in arriving at Carter's taxable income as shown in the notice of deficiency allowed farm losses in the years 1951, 1952, 1953 in the respective amounts of $12,643.49, $2,789.87, and $7,064.13, although these amounts were not specifically set forth in such notice of deficiency. Carter did not conduct farming operations with the intention of making a profit and such operations did not constitute the *139 conduct of a trade or business. [Fraud] Some part of the deficiency in income tax in each of the years 1948 through 1953 in the case of Brame was due to fraud with intent to evade tax. Some part of the deficiency in income tax in each of the years 1948 through 1953 in the case of Carter was due to fraud with intent to evade tax. Failure to File Declarations of Estimated Tax In the notices of deficiency the respondent determined additions to tax against Brame for each of the years 1948 through 1953 under both sections 294(d)(1)(A) and 294(d)(2) of the Internal Revenue Code of 1939. This was based on the ground that Brame had failed to file any declarations of estimated tax. In none of Brame's income tax returns for the years 1948 through 1953 did he claim credit for any tax paid pursuant to any declarations of estimated tax. The respondent in the notices of deficiency determined additions to tax against Carter for each of the years 1950 through 1953 under both sections 294(d)(1)(A) and 294(d)(2) on the ground that Carter had failed to file declarations of estimated tax for those years. He did not determine such additions to tax in the deficiency notice for the years *140 1948 and 1949. However, by amendment to his answer he alleged that Carter is liable for additions to tax under each of those provisions for those years. In none of Carter's income tax returns for the years 1948 through 1953 did he claim credit for any tax paid pursuant to any declarations of estimated tax. Opinion When these cases were called for trial the respondent moved that they all be consolidated for trial and disposition. Each of the petitioners was represented by the same counsel, who opposed such motion. The question of whether cases should be so consolidated is one to be decided in the sound discretion of the trial court. Cohen v. Commissioner (C.A. 10), 176 F.2d 394, affirming 9 T.C. 1156 and 10 T.C. 201. The Court denied the respondent's motion for consolidation for trial upon the strong representation of counsel that consolidation would be prejudicial to one or more of the parties, and proceeded to hear Carter's case first. As the trial progressed it became increasingly clear that the principal issues involved in each of the three *141 cases revolved about the business transactions of the corporation and the manner in which the individual petitioner, its two equal stockholders, conducted its financial affairs, particularly the manner in which they withdrew amounts from the corporation and handled its accounts receivable and the checks drawn in favor of the corporation by finance companies. Accordingly, the Court permitted the introduction in the Carter case of testimony and exhibits which related also to the other petitioners. Counsel for the parties stipulated that most of the evidence in the Carter case might be considered as evidence in such other cases, subject, however, to the objection of counsel for the petitioners as to relevancy and materiality. Similar action was taken in the trial of the other two cases. [3] At the trial the Court specifically stated that the cases might be consolidated for disposition if it should develop that this was the most convenient and desirable way of handling the cases. We have so consolidated them for purposes of opinion not only for convenience, but because as a practical matter it is necessary to a proper understanding of the cases. *142 The record shows that the revenue agents made a careful and thorough investigation and that they worked closely with the certified public accountant, Bourgeois, who had been employed by the petitioners to compute their tax liabilities, and who represented them in filing pleadings in these cases. Bourgeois made complete audits and his audit reports formed the basis for the settlement of the Louisiana State income taxes of the individuals and also the basis for the later settlement in 1954 of the financial relations between the two individuals. In general the results of the revenue agents' audits were substantially in accord with those of Bourgeois. The accountant's audit reports were turned over to the attorney for the petitioners who in turn made them available to the revenue agents pursuant to subpoena. They were submitted in evidence. Bourgeois testified as a witness for both the respondent and the petitioners. A somewhat similar situation was presented in Emilie Furnish Funk, 29 T.C. 279, affd. in Furnish v. Commissioner (C.A. 9), 262 F.2d 727, and we concluded that the auditor's report was highly reliable evidence of the taxpayer's income. In affirming *143 this Court, the Court of Appeals took the view that an audit prepared by an accountant of the taxpayer's own choice is sufficient to support a finding of income in the amount shown in such report. In the instant case we consider the accountant's audit reports of particular significance inasmuch as they formed the basis for the later settlement of the financial matters between the petitioners arising out of their association in the corporation. His reports will be referred to hereinafter with respect to particular items. We have carefully examined this voluminous record with the results set forth in our Findings of Fact. The various items in controversy will be discussed separately. Monthly Payments to Brame and Carter The respondent contends that the monthly payments which were made to each of the individual petitioners over the period 1948 through May 1953, were informal dividends paid by the corporation to them. The petitioners contend that these payments did not constitute taxable income. Their argument is to the effect that these payments, which were debited to the personal accounts of the individuals, were loans to them giving rise to debts owing to the corporation. They *144 insist that the evidence shows that Carter paid the amount of the debit balance shown in his account in 1954 at the time he sold his stock to Brame and that Brame in 1957 paid the debit balance in his account through the payment at that time of corporate indebtedness with money which he obtained from the sale of his individually owned property. At the outset it should be stated that in May 1953, the corporation adopted a policy retroactive to February 1953, of paying salaries and treated the monthly payments which had been made to each of the individuals during the months of January through May 1953, as salary payments, upon which taxes were withheld and which the individual petitioners included in their returns as salaries received. We agree that the petitioners properly included such payments as salary. Consequently such payments for those months will not again be treated as income of the individuals, and the discussion hereinafter will relate only to monthly payments during the calendar years 1948 through 1952. The evidence shows that these monthly payments, as well as certain weekly payments referred to hereinafter, were made to the individuals during the interim that the corporation *145 was not paying salaries as such. They were not characterized in any way on the books of the corporation, except that they were debited to the personal accounts of the individuals. Neither Brame nor Carter testified specifically as to the purpose of the corporation in making the payments. It appears that the payments were made without restriction as to use thereof by the individuals, and the corporation's bookkeeper testified that he was unaware of any agreement that these amounts would be repaid, that no such agreement had ever been discussed with him, and that there were no notes or other evidences of indebtedness. We note that the corporation in its income tax returns showed no amounts or relatively small amounts due and owing to it at all pertinent times from its officers and employees. Also, the corporation's financial statements to the Chrysler Corporation, apparently prepared in some years on the erroneous representation that the business was operated as a partnership, show only small amounts owing from officers and employees and show "drawings" of "partners" in much smaller amounts than the debit balances shown in the personal accounts. And the individuals themselves, in personal *146 financial statements submitted to banks during the period here involved, showed no amounts owing from them to the corporation or from the corporation to them. Whether withdrawals constitute loans or distributions is a question of fact to be decided upon all the evidence and depends upon the intent existing at the time the withdrawals are made. Clark v. Commissioner (C.A. 9), 266 F. 2d 698, affirming on this issue a Memorandum Opinion of this Court. From a consideration of all the evidence, it is our conclusion that at the time the monthly payments were made there was no intention of repayment, that there was no restriction as to the use of the funds, and that they constituted distributions by the corporation to the individuals. See William C. Baird, 25 T.C. 387, which involved a similar situation and in which we concluded that distributions were made. It is true that as these payments were made they were debited to the personal accounts of the individuals, and that from an accounting standpoint such debits, in the absence of other evidence, might indicate amounts *147 owing to the corporation. However, bookkeeping entries, although evidentiary of the facts which they purport to record, are not conclusive. Doyle v. Mitchell Bros. Co., 247 F. 2d 179; Helvering v. Midland Mutual Life Ins. Co., 300 U.S. 216; Commissioner v. North Jersey Title Ins. Co. (C.A. 3), 79 F. 2d 492; Eli D. Goodstein, 30 T.C. 1178, affd. (C.A. 1), 267 F. 2d 127; Bennett E. Meyers, 21 T.C. 331; and Chatham & Phenix Nat'l Bank, 1 B.T.A. 460. A careful study of the personal accounts discloses that, although there were a number of credits reflected thereon, there is no pattern of credits indicating repayments of these monthly payments. Actually the accounts showed substantial increases in the debit balances in each of the years in question, except the year 1953. Brame's account showed a debit balance of $8,100.26 at January 1, 1948, and a debit balance at January 31, 1954 of $30,119.38. Carter's account showed a debit balance at January 1, 1948 of $8,279.35 and at January 31, 1954 of $41,610.89. In Brame's case the debit balance would have been considerably higher at January 31, 1954, but *148 for credits made for some large cash payments in 1952 and 1953 and a payment of a sizeable corporate note in 1953. Carter was also credited with a cash payment in 1952. We do not consider that these payments indicate that these personal accounts represented loan accounts, particularly since the payments were made after the investigation had commenced. Rather, these accounts would appear to be accounts intended to provide an accounting between the two stockholders. Indeed, it appears that in some respects the two individuals continued to regard themselves as partners and it seems that they regarded these personal accounts as drawing accounts of partners. We note also that Bourgeois, in an attempt to establish the financial obligations as between the two individuals, later increased the debit balances of each at December 31, 1954, by large amounts because of receipts by each of accounts receivable and dealer reserve payments which in reality were due the corporation. We cannot agree with petitioners' contention that at the time Carter sold his stock to Brame he paid the debit balance in his personal account. Checks in identical amounts were passed between the corporation and Carter, *149 resulting in no net payment by Carter to the corporation. The amount of the debit balance in Carter's account was transferred over to Brame's account. Nor does the record indicate that Brame actually paid the debit balance in his account in 1957. All that appears is that he was required to pay large debts of the corporation and that, therefore, his personal account was closed out. But even if it were considered that the debit balances, which included the monthly payments, were paid by these means, this would not prove that there was any intention on the part of the individuals back in the years 1948 through 1953 to repay the amounts then being paid to them regularly each month, particularly since the closing of the accounts occurred after the tax controversies arose. Clark v. Commissioner, supra. The petitioners make much of the fact that the individuals had borrowed large sums of money jointly and had turned this money over to the corporation for its use. They claim that this resulted in an indebtedness to them from the corporation which was at all times in excess of the debit balances shown in their personal accounts. It is true that the corporation was not directly *150 indebted to the bank, yet it treated the loan on its books as owing by it to the bank and made payments to it in curtailment thereof. Even if it were assumed that the corporation was indebted to the individuals (contrary to representations made by them in financial statements), the repayment to them would consist of the payments which the corporation regularly made to the bank on the indebtedness. There is no intimation anywhere in the record, and indeed the petitioners do not specifically argue, that the monthly payments made by the corporation to them were payments on any indebtedness which the corporation owed to them. As stated, these monthly payments constituted distributions by the corporation to the individuals. It is well established that distributions may constitute dividends notwithstanding that the formality of a dividend declaration is not observed and that they are not recorded on the corporate books as dividends. Lengsfield v. Commissioner (C.A. 5), 241 F. 2d 508, affirming a Memorandum Opinion of this Court; Paramount-Richards Theatres, Inc. v. Commissioner (C.A. 5), 153 F. 2d 602, *151 affirming a Memorandum Opinion of this Court; and Irving Sachs, 32 T.C. 815, affd. Sachs v. Commissioner (C.A. 8), 277 F. 2d 879, and cases cited therein. Such distributions are taxable to the individuals to the extent paid out of earnings and profits of the corporation. Section 115 of the Internal Revenue Code of 1939. [4] The returns of the corporation for the years in question show earned surplus and undivided profits in large amounts. Also, its returns for each year, except the fiscal year ended January 31, 1954, show the receipt of substantial amounts of income. Furthermore, as a result of this Opinion the profits of the corporation will be increased for some years. While neither party has attempted to show precisely the accumulated earnings or profits at any particular time or the earnings or profits of any particular year, it seems apparent that there were sufficient accumulated earnings or profits or earnings or profits of each particular year to cover any distributions made, whether formal or informal. However, if necessary, a computation of available earnings and profits will be made in connection with the recomputation under Rule 50, in the light *152 of all the holdings herein. *153 Inasmuch as these regular payments were being made during the interim that the corporation was not paying salaries as such, we have given careful consideration to the possibility of treating them as salary payments, which would result in the allowance of deductions on account thereof by the corporation. However, there is no basis upon which we can reach a conclusion that these were salary payments, except for those made in the year 1953. The corporation did not characterize them as such, apparently there was no corporate action authorizing the payment of salaries in these amounts, there was no withholding of tax thereon, and the corporation claimed no deduction on account thereof. Indeed, the corporation specifically changed its policy and commenced paying salaries in 1953 at the instance of Bourgeois, who recommended that salaries be thereafter paid in order that the corporation might be entitled to deductions on account thereof. We conclude that the corporation is not entitled to deduct these monthly payments. Weekly Payments to Brame and Carter During each of the years in question the corporation paid Brame and Carter each $100 per week, except that in the calendar year 1953 *154 it paid each of them $2,050. These payments were reflected on the books of the corporation as travel and entertainment expense and were deducted by the corporation. The individuals did not return these amounts as income. The respondent contends that they are taxable on the full amounts received as informal distributions by the corporation to them. Apparently he alternatively contends that they are taxable as salary payments. The petitioners contend that these amounts were paid to them to be expended on behalf of the corporation for travel and entertainment expenses and that therefore they cannot be charged with income on account thereof. We cannot agree with this contention. It seems significant to us that each received exactly the same amount, neither had to account to the corporation for expenditures made, and neither of them ever paid back to the corporation any portion of the payments. It seems most unlikely that it would have been contemplated that each would incur precisely the same amount of expenditures of this nature. We are satisfied from the evidence that these payments were theirs to dispose of as they saw fit. While Brame and Carter each testified that he spent more *155 than these amounts for travel and entertainment, neither of them presented any evidence as to any specific expenditure made in any particular year. Each stated that he had traveled to other cities on business, but there was no estimate made by either of amounts expended in any year, and there was no mention made of any type of business entertainment. We think it significant that the payments were made during an interim when the corporation was not making any payments denominated as salaries, and that in 1953, after the corporation resumed payments of salaries as such, it did not claim any deduction on account of travel and entertainment. Under these circumstances it is our conclusion that these weekly payments were intended to be, and were in fact, payments of salaries. It is true that these payments, like the monthly payments hereinabove discussed, were not denominated salaries. However, in the case of these weekly payments, we think it fairly appears that the payments were made for services rendered. Accordingly, these weekly payments are includible in taxable income of the individuals. Of course, the individuals would be entitled to deduct such amounts as might be shown to have *156 been expended for travel and entertainment expenses, but they have not adduced any evidence upon which we can find that in any of the years any amount was so expended, except for the stipulation of the parties that Brame had deductible travel and entertainment expense in the year 1948 in the amount of $75. Under these circumstances there is no basis whatever for making any estimate of amounts which might have been expended. Chesbro v. Commissioner (C.A. 2), 225 F. 2d 674, affirming 21 T.C. 123. The corporation is entitled to deduct these salary payments which, upon the record, do not appear to be unreasonable in amount. In addition, as noted in our Findings of Fact, for the fiscal years ended January 31, 1949, 1950, and 1951 the corporation is entitled to deduct relatively small amounts for travel and entertainment expense, over and above these weekly payments, but less than the amounts which it had claimed in its returns. Additional Income of Brame and Carter In the notices of deficiency and in the amended pleadings the respondent alleged that the individuals had large amounts of income in addition to the monthly and weekly payments received by *157 them from the corporation and in addition to certain specific items of income, as referred to in our Findings of Fact. Since the individuals did not keep records from which their taxable income could be computed, the respondent employed the bank deposit and cash expenditures method to determine the amount of unreported income. His contention is that the amounts so determined consist of amounts diverted by the individuals from the corporation, which included collections of accounts receivable of the corporation which remained open on the corporation's books, payments made by finance companies from dealer reserve accounts maintained for the corporation, and amounts due the corporation from finance companies on the discount of notes. The petitioners' accountant Bourgeois also concluded that the individuals had received in the years in question large additional amounts of unreported income by diversions from the corporation and he likewise found it necessary to resort to the bank deposit and cash expenditures method, employing in conjunction therewith a net worth computation. Both the revenue agents and Bourgeois, in identifying the sources of funds deposited and expended by the individuals, *158 made calculations of the amounts received by each of them from the collection of accounts receivable and from payments from the dealer reserves. There were available records of Commercial Credit Corporation and Universal CIT Credit Corporation from which the payments from the dealer reserves could be ascertained. Since it is possible from the record to determine the amounts of income derived by each of the individuals from dealer reserve accounts, we have made specific findings and holdings with respect thereto, thus treating that as a specific item adjustment. The same is true also as to the collection of some of the accounts receivable. These will be discussed separately. There were also introduced into evidence many other checks of finance companies drawn in favor of the corporation in the years 1950 through 1953, which were cashed or negotiated by the individuals. Both the respondent and Bourgeois concluded that the individuals had received large amounts of unreported income from this source, but could not precisely fix the amount received by each. In addition to this, for the years 1948 and 1949 they did not have the benefit of the records of Commercial Credit Corporation, *159 which had been destroyed. Under these circumstances, we think there can be no question that the use of the bank deposit and cash expenditures method is proper. Under similar circumstances the use of this method has been approved in many cases, both civil and criminal. United States v. Johnson, 319 U.S. 503; Goldberg v. Commissioner (C.A. 5), 239 F. 2d 316, affirming in part a Memorandum Opinion of this Court; Olinger v. Commissioner (C.A. 5), 234 F. 2d 823, affirming in part a Memorandum Opinion of this Court; Viles v. Commissioner (C.A. 6), 233 F. 2d 376, affirming a Memorandum Opinion of this Court; United States v. Caserta (C.A. 3), 199 F. 2d 905; and Cohen v. Commissioner, supra.
Accounts Receivable The evidence clearly establishes that in each year the individual petitioners failed to report substantial amounts represented by payments of corporate accounts receivable, which payments were not recorded on the corporate books but were diverted to the use and benefit of the individuals. Brame directed that large amounts be charged against him in a special personal account on the books of the *160 corporation. Furthermore, both Brame and Carter admitted to the accountant Bourgeois that they had collected accounts receivable and they acquiesced in his action in increasing debit balances in their personal accounts as a result of these collections. Bourgeois' audit reports, including adjustments on account of such collections, were accepted by the individuals for settling both their state tax liabilities and the financial relations between them. The total amount of accounts receivable which the revenue agent found was paid over the years in question to the individuals and not recorded as received by the corporation was $29,601.82. We have concluded and have found as a fact that Brame and Carter collected for their own use at least the amounts found by Bourgeois in his audit reports which, as stated, were in effect admitted by the individuals, in the total amount of $15,974.14 as set forth in detail in our Findings of Fact. We have accordingly found that such amounts constituted distributions by the corporation to them. To the extent of available corporate earnings and profits they represent taxable dividends to such individuals. Our conclusion is in accord with numerous cases *161 involving the diversion of payments of accounts receivable and other items of corporate income. Currier v. United States (C.A. 1), 166 F. 2d 346; Jack M. Chesbro, 21 T.C. 123, affd. (C.A. 2) 225 F. 2d 674, certiorari denied 350 U.S. 995; Bernstein v. United States (C.A. 5), 234 F. 2d 475, certiorari denied 352 U.S. 915; Dawkins v. Commissioner (C.A. 8), 238 F. 2d 174, affirming a Memorandum Opinion of this Court; Drybrough v. Commissioner (C.A. 6), 238 F. 2d 735, affirming on this issue 23 T.C. 1105; Simon v. Commissioner (C.A. 8), 248 F. 2d 869, remanding a Memorandum Opinion of this Court; Clark v. Commissioner, supra, and Irving S. Federbush, 34 T.C. - (July 29, 1960). Cf. Davis v. United States (C.A. 6), 226 F. 2d 331, and Hartman v. United States (C.A. 8), 245 F. 2d 349, two criminal tax evasion cases, in which convictions were upheld on the basis of the diversion of corporate funds irrespective of whether the corporation had sufficient earnings and profits. Dealer Reserves Throughout the years *162 1949 through 1953 Commercial Credit Corporation made payments aggregating $22,724.79 representing amounts due from the dealer reserve account maintained by it for the corporation. However, the evidence shows that the corporation did not receive such payments and they do not appear on its books. Checks representing all such payments are in evidence, except the two payments made in 1949 aggregating $1,205.47. Five of such checks aggregating $8,574.35 were endorsed in the name of the corporation by Brame, four of them bearing a notation indicating that they were paid by the bank in cash, and the fifth one bearing also the endorsement of Harrell who testified that he was accustomed to cashing checks for the two individuals. Twenty-one of the checks aggregating $12,944.97 were endorsed in the name of the corporation by Brame and also bear the endorsement of Commercial Credit Corporation, showing that these same checks were deposited in the bank account of Commercial Credit Corporation. David D. McDonough, an employee of Commercial Credit Corporation, testified that from merely examining these 21 checks he could not conclude definitely what the transactions represented. He stated that *163 the fact that these checks were redeposited in Commercial Credit Corporation's account after endorsement by Brame might indicate that these same checks served the purpose of paying an obligation from the corporation to Commercial Credit Corporation, possibly as a result of a repossession for which the dealer was liable. On the other hand, he testified that he could not state definitely that Commercial Credit Corporation did not pay out cash in the amount of these checks. It is our conclusion and we have found as a fact that all the payments from the Commercial Credit Corporation reserve account were paid in cash and that they were not received by the corporation. We are also satisfied that none of the amounts was paid on behalf of the corporation by the individual petitioners. If any of these checks had been used to discharge any obligations of the corporation to Commercial Credit Corporation, we think the books and records of the corporation would have reflected these payments. Yet the evidence shows that none of these payments from Commercial Credit Corporation appears on the books of the corporation. The evidence also shows that in 1953 Universal CIT Credit Corporation issued *164 a check for $452.09 for payment of the amount due from the dealer's reserve account it maintained for the corporation. This check was cashed by Brame and it was not received by the corporation and is not reflected on its books. For the reasons stated above, we are satisfied that this payment was received by Brame and not by the corporation. The only payment from a dealer's reserve account of any finance company which appears on the books of the corporation in the years in question is an amount of $1,000 in the fiscal year ended January 31, 1950. We are not advised what finance company made that payment to the corporation, but the records of Commercial Credit Corporation clearly disclose that it did not come from Commercial Credit Corporation, and therefore is not a duplication of any of the amounts referred to above. [5]
Brame testified that he could not explain the *165 transactions involving the checks which were endorsed by him and which were redeposited in the bank account of Commercial Credit Corporation. As we understand his testimony it was to the effect that all these transactions could have represented payments of obligations of the corporation to Commercial Credit Corporation in instances of repossessed cars or "a floor planned car." He stated that there was nothing on the check to indicate to him the nature of the transaction and that the explaining vouchers were in the possession of Commercial Credit Corporation. He said that he had not attempted to identify these transactions. We are not persuaded by Brame's testimony that the proceeds were used in payment of any corporate obligation. Nor could he explain the other checks representing withdrawals of dealer reserve funds. We are satisfied from this record and have found as a fact that Brame initially received the cash represented by all the dealer reserve checks. Furthermore, we believe and have found that although Brame initially received the cash from the checks, the proceeds were shared equally by him and Carter. These are the only conclusions that can be reached upon this record. *166 We cannot believe that Carter, who was active with Brame in the management of the corporation, would have been unaware of the fact that Brame had received cash belonging to the corporation and would have permitted this without receiving his share of such withdrawals either directly or indirectly. Furthermore, as pointed out in our Findings of Fact, the accountant Bourgeois treated the payments from the dealer reserve accounts as having been received equally by Brame and Carter. The substance of his testimony was that, although not specifically admitting they had received these amounts, the individual petitioners accepted his allocations and did not advise him of any obligations of the corporation which had been paid with these funds. The individuals accepted this allocation in the later settlement of their financial relations, by acquiescing in the action of Bourgeois in charging their personal accounts because of such receipts. The amounts we have found are less in the aggregate for all years than the amounts included by Bourgeois in his audit reports. It is our conclusion that these payments constituted informal or constructive dividends to each of the individuals to the extent *167 paid out of earnings or profits of the corporation. Unidentified Income Computed by Bank Deposit and Cash Expenditures Method The respondent introduced into evidence over 150 checks issued by Commercial Credit Corporation and Universal CIT Credit Corporation in favor of the corporation during the years 1950, 1951, 1952, and 1953. We have carefully examined all these checks and have listed in our Findings of Fact those which were cashed or negotiated by the two individuals, and were therefore never deposited in the corporation's bank account. At the hearing the individuals were shown all the checks and were asked to explain the disposition of the proceeds. They testified in very general terms that sometimes they or the corporation would act for customers in obtaining loans from finance companies, in which event a check would sometimes be issued by the finance company in favor of the corporation which would then be passed on to the customer; that in some instances a check from a finance company might represent a payment to the corporation for the specific purpose of purchasing insurance; and that checks in small amounts did not represent payments on discounted notes, but were *168 either adjustments of errors or refunds to purchasers of portions of finance charges or insurance upon the prepayment by such purchasers of their obligations to the finance company. Presumably, their testimony was intended to convey the thought that in all such instances the proceeds merely passed through their hands and were not appropriated to their own use. They also testified that on occasion a check might represent payment for a personal car which either of them had sold. However, they were able to identify only a few of the checks as coming within any of the above categories, and these we have not included in our Findings of Fact. Nor have we included certain checks which it reasonably appears may have been used for the payment of some indebtedness of the corporation. We have also excluded certain of the checks in small amounts which Brame testified represented refunds, upon the assumption that he meant that he had passed the proceeds on to customers. Both Brame and Carter testified that any money which they may have obtained from cashing checks drawn in favor of the corporation was used to discharge some corporate indebtedness, but they were unable to identify any such instances. *169 The pattern disclosed by the cashing of these checks by the individuals indicates to us that at least some substantial portion of the proceeds of the checks was diverted to the use of the individuals. Although Brame cashed or negotiated the great bulk of these checks, it is our conclusion that Carter shared in the proceeds, and that the unidentified income of each individual disclosed by the bank deposit and cash expenditures method is composed in large part of the diversion to themselves of finance company payments. Such unidentified income may also include other receipts such as accounts receivable by the individuals in excess of the specific amounts which we have found. We have set forth in the Findings of Fact the respondent's computations of unidentified income of each individual and the revisions which we have concluded are necessary and proper in view of the record and our findings and holding. The principal elements in the computation are not in dispute. At the hearing the parties agreed that the testimony and computations of both the agent and Bourgeois with respect to bank records would be acceptable in evidence without production of such records. In addition, counsel for *170 the petitioners admitted that all the cash expenditures shown by the respondent in the computations were made, although he stated that he did not necessarily agree with the agent's classifications of all expenditures as between business and personal. In his computation the respondent made allowance for withdrawals from the bank accounts, thus insuring that there would be no duplication of computed income by use of both cash expenditures and unidentified bank deposits. He also eliminated large amounts which he determined represented nontaxable receipts. We have made several revisions in the respondent's computations as required by the evidence and to take into account and give credit for all identified income and receipts including both the items reported by the petitioners and the items of income which we have specifically found. The petitioners do not seriously dispute the respondent's computations of unidentified income, which are substantially in accord with those made by their accountant, Bourgeois, except in one respect. They impliedly admit that their unidentified deposits and cash expenditures exceeded their receipts in the years in question, but contend that any excess is *171 explained by the use of cash which they had on hand at January 1, 1948, in safe deposit boxes. It is, of course, of the utmost importance to determine, if possible, whether, and to what extent, each had cash at that date. The respondent in his computations did not credit either petitioner with any cash as of that time. Brame testified that he had cash in a safe deposit box at the end of 1947 in the amount of between $58,000 and $59,000. He and Carter testified that they went to the bank at some time in the fall of 1947 and counted it. We are not persuaded by their testimony that they did this. There were placed in evidence the bank's records of entries made to Brame's safe deposit box, which show that on the three occasions he visited his box in the Fall of 1947 he remained only one minute. Clearly it would have been impossible to count in one minute this much money particularly if, as Carter testified, it consisted in part of small denominations. There was some testimony to the effect that entries into the safe deposit vault were sometimes made without signing the bank's records, but there was no corroboration of this testimony by bank employees or others. Indeed, Brame at one point *172 testified that he always signed the records when he went into his safe deposit box. Furthermore, while Brame may have had some cash on hand in his safe deposit box, we think the evidence clearly indicates that he did not have any such amount as he claims. The evidence shows that from 1940 through 1947 Brame and his wife paid total income taxes as follows: 1940, $243.50; 1941, $787.58; 1942, $911.48; 1943, $423.42; 1944 none; 1945 none; 1946, $84.79; and 1947, $619.94. To us this is indicative that Brame did not have sufficient income in prior years to have accumulated any such amount of cash as he claims. Furthermore, at January 31, 1948, Brame was indebted to the bank for $1,000 of borrowed money and he and Carter were jointly indebted to the bank for $33,500 of borrowed money which was used by the corporation. It has been stipulated that Brame paid interest in the amount of $136.22 in 1948 and larger amounts in subsequent years. It is highly improbable that Brame would have borrowed money and paid interest thereon had he had such a hoard of cash as he claims, and he did not give any plausible reason for so doing. See Anderson v. Commissioner (C.A. 5), 250 F. 2d 242, *173 and Goe v. Commissioner (C.A. 3), 198 F. 2d 851, certiorari denied 344 U.S. 897, affirming Memorandum Opinion of this Court. Brame's testimony was contradictory and unreliable. We also note that although he testified that he had $25,000 in his safe deposit box on December 31, 1951, and $17,000 on December 31, 1952, in financial statements which he furnished to his bank on October 4, 1951, and January 1, 1953, Brame represented that he had cash on hand and in banks of only $1,000 and $2,000, respectively. It is also of some significance that Bourgeois, in his computation of Brame's unreported unidentified income, allowed no cash at January 1, 1948, because Brame could not or would not commit himself to a specific amount. And in his petition to this Court filed in 1954, Brame stated that he had undeposited cash at December 31, 1947, "but the amount thereof has not yet been definitely determined." Since the whole record shows that Brame was accustomed to expending sizeable amounts of cash at various times, we think it reasonable to conclude that he did have some cash on hand at January 1, 1948, which may have been used for making expenditures and deposits *174 thereafter. [6] Brame kept no records of cash on hand and the record does not permit of a precise finding as to the amount of cash. However, since we believe that he should be allowed some amount we have exercised our best judgment in the light of the whole record and have concluded that he had on hand an amount of $2,500 in cash at January 1, 1948. We have included this amount in the computation of his unidentified income. Carter testified that at the end of 1947 he had cash in the amount of $68,000 to $70,000 in his safe deposit box. He and Brame testified that they together went to the safe deposit box at sometime in the Fall of 1947, took out the money that was contained therein, put it in a paper *175 bag, returned to their office and counted the money. Carter testified that he returned the cash to the safe deposit box that same day. We consider Carter's testimony also unreliable, and we reject this story. The bank records show that Carter did not make more than one entry in any one day during the year 1947. Carter testified that he at times entered his safe deposit box without signing the bank records. However, we are unwilling to accept this as the truth in the absence of any corroboration by bank employees that this was permitted. We do not doubt that Carter had some cash, but the record as a whole indicates to us that he could not have had any such amount as he claims. As indicated above he and Brame jointly borrowed a substantial amount of cash from the bank for the use of the corporation, and it has been stipulated that Carter paid interest in the amount of $244.71 in 1948 and other amounts in later years. It is our conclusion, as in the case of Brame, that it is highly improbable that Carter would have borrowed money and paid interest thereon had he had such a hoard of cash as he claims. We also note that Carter testified to having withdrawn in June or July of 1951 an amount *176 of $40,000 from his safe deposit box in Baton Rouge and placing it in a safe deposit box in Natchez. But the records of the Baton Rouge bank show the only time Carter entered his box in 1951 was in February. Furthermore, on May 27, 1949, and on November 9, 1950, he furnished financial statements to his bank representing that he had cash on hand and in banks in the amounts of only $8,000 and $2,610.60, respectively. Carter likewise was unwilling or unable to definitely go on record, at Bourgeois' request, as to the amount of cash he had on hand at January 1, 1948, and Bourgeois accordingly allowed no opening cash in his computation of Carter's unidentified income. Nevertheless, we think that since the record indicates that Carter was accustomed to expending sizeable amounts of cash, it is reasonable to conclude that he did have some cash at January 1, 1948, which may have been used for making deposits and expenditures thereafter. Here also, as in the case of Brame, we have had to make the best estimate possible from the whole record. We have concluded and found that Carter had cash on hand at January 1, 1948, in the amount of $3,000, and have included that amount in the computation *177 of his unidentified income. It is noted that the respondent gave Carter credit for cash of $15,300 actually on hand at January 1, 1943, which he had included as a "cash expenditure" in 1952. A similar situation is disclosed by the record as to Brame at the close of 1952 and the beginning of 1953. The revenue agent's schedule shows that Brame was charged with a "cash expenditure" of $2,988.05, representing cash actually on hand at December 31, 1952. The respondent did not, however, give Brame credit for this cash in the computation of unidentified income of 1953. We have done so in our revision of the respondent's computation. In the respondent's computation of unidentified income in the case of each individual petitioner he has given credit for identified cash receipts in the amount of the accounts receivable which he claims the record proves that they received and which he proposes to tax to them. The amounts of such accounts receivable which we have found that the evidence definitely shows they received are less than those claimed by the respondent, and accordingly we have, in our revised computation of unidentified income, given petitioners credit for identified cash from this *178 source in the lesser amounts. It may be added that a careful examination of the exhibits fails to disclose that the larger amounts used by the respondent were actually identified. Rather, it appears that he gave credit for these large amounts because he proposed to tax them upon such amounts. As set forth in our Findings of Fact, the unidentified and unreported income of Brame and Carter, computed by the bank deposit and cash expenditures method was as follows: 1948
1949
1950
1951
1952
1953
Brame
$18,887.74
$10,813.46
$3,174.64
$16,190.64
$ 5,108.61
$5,278.56
Carter
20,499.42
20,140.15
8,312.77
14,370.89
13,730.10
2,923.62 These computations reflect unreported income from any and all sources. It does not appear that the individual petitioners had any business activities other than those described in our Findings of Fact, and the respondent does not contend that they had. We think it reasonable to conclude that the bulk of this unidentified and unreported income consisted of diversions of amounts due the corporation from finance companies, principally from the discounting of notes, although, as previously stated, it may also include *179 some income from collection of the corporation's accounts receivable. These amounts constitute taxable dividends to them to the extent of available earnings and profits of the corporation. Farms Under the pleadings there is at issue the question whether Brame is entitled to deductions on account of farm expenditures in each of the years 1948 through 1953. This issue is raised in Carter's case as to the years 1950 through 1953. [7]
Whether an enterprise is conducted as a business for profit is a matter of intention and good faith, and all the facts in a particular case are to be considered. Commissioner v. Field (C.A. 2), 67 F. 2d 876, affirming 26 B.T.A. 116; Doggett v. Burnet (C.A.D.C.), 65 F. 2d 191; *180 Thacher v. Lowe, 288 Fed. 994; Edwin S. George, 22 B.T.A. 189; and American Properties, Inc., 28 T.C. 1100, affd. (C.A. 9), 262 F. 2d 150. Intention is a question of fact to be determined not only from the direct testimony as to intent, but from a consideration of all the evidence, including the conduct of the parties. The statement of an interested party of his intention and purpose is not necessarily conclusive. Helvering v. National Grocery Co., 304 U.S. 282, affirming 35 B.T.A. 163. Brame testified that it was his intention when he acquired the farm to try to make some money out of it, and that in the past he had had a profitable farm operation. Carter testified that his intention at the time he acquired both the Greenville Springs Road property and the Manchac Plantation was to breed and sell horses and conduct a profitable business and that when he bought Manchac Plantation he bought cattle for the purpose of making a profit. Taking into consideration all the evidence presented, we cannot accept this testimony of the individuals as determinative here. These petitioners were in the automobile *181 business and devoted their full business time to that business. The farms were used as their residences. Neither petitioner in any of his returns claimed any deductions on account of expenditures in connection with the farming operations. No records were kept of the farming operations as would be true in the case of a bona fide business operation. Some income was derived from these operations by each individual. However in the case of Brame it was insignificant in most years. In the case of Carter the income was relatively higher, but still quite disproportionate in the aggregate to the expenditures made. Each of them had continuing substantial losses throughout the years that they operated the farms. It is true, of course, that a record of losses over a series of years does not in itself preclude the allowance of such losses as business expenses, but the continuing lack of profits is an important factor bearing on the taxpayer's true intention. Morton v. Commissioner (C.A. 2), 174 F. 2d 302, certiorari denied 338 U.S. 328, and Thacher v. Lowe, supra.The evidence as a whole negates the view that either petitioner had a program of development *182 of farm operations calculated or intended to ultimately lead to a profitable enterprise. Upon a careful consideration of the record as a whole, we have concluded and have found as a fact that neither petitioner conducted the farming operations with the intention of making a profit, and that in neither case did such operations constitute the conduct of a trade or business. Rather, it appears to us that the farm activities were incidental to the use and enjoyment of these properties as the petitioners' personal residences. See Coffey v. Commissioner (C.A. 5), 141 F. 2d 204, affirming 1 T.C. 579; Louise Cheney, 22 B.T.A. 672; and John Randolph Hopkins, 15 T.C. 160. As such, they constitute personal nondeductible expenditures within the meaning of section 24(a)(1) of the Internal Revenue Code of 1939. In the recomputation under Rule 50, the petitioners will not be entitled to any deductions on account of farming operations. Fraud Issues For each of the years 1948 through 1953 the respondent has made 50 per cent additions to the deficiencies computed by him, asserting that some part of the deficiency of each individual is due *183 to fraud with intent to evade tax. Section 293(b) of the Internal Revenue Code of 1939. [8] Upon this issue the burden of proof rests upon the respondent. Section 1112 of the Internal Revenue Code of 1939. And it has been held that fraud may never be presumed but must be shown by clear and convincing proof. Archer v. Commissioner (C.A. 5), 227 F. 2d 270; Drieborg v. Commissioner (C.A. 6), 225 F. 2d 216; Kashat v. Commissioner (C.A. 6), 229 F. 2d 282; Arlette Coat Co., 14 T.C. 751; Frank Imburgia, 22 T.C. 1002; and Shaw v. Commissioner (C.A. 6), 252 F. 2d 681, affirming 27 T.C. 561. *184 In the instant case the evidence affirmatively establishes that in each of the years in question each petitioner diverted from the corporation substantial sums of money through collection of accounts receivable of the corporation and collection of payments from finance companies owing to the corporation, and that these amounts were not included in any records kept by them or in their returns. Indeed, they kept no records from which their taxable income could be computed. Both of them dealt largely in cash and there was no way to precisely determine their income. Both the respondent and the certified public accountant employed by the petitioners found it necessary to resort to the bank deposit and cash expenditures method of determining a portion of the income received by the petitioners from the finance companies, principally the amounts of payments on discounted notes of the corporation. In addition, there were numerous smaller items which the petitioners failed to report on their returns, such as interest and capital gains upon the sales of property. The only income, with minor exceptions, reported by the two individuals consisted of certain formal dividends from the corporation *185 and salary payments in the year 1953. It appears that the recomputation will disclose that the total amount of income which each petitioner should have reported, computed in accordance with our conclusions herein, ranges from about twice the amount reported to many times the amount reported over the various years. The amounts diverted by them from the corporation through the collection of accounts receivable, dealer reserve payments, and "unidentified income," range from 1 to 8 times the total income reported by them. While the mere omission of reportable income is not of itself sufficient to establish fraud, there can be no question that repeated understatements of taxable income over a period of years, coupled with circumstances showing an intent to conceal or misstate taxable income, does indicate an intent to evade tax. Holland v. United States, 348 U.S. 121; Bryan v. Commissioner, (C.A. 5), 209 F. 2d 822; Anderson v. Commissioner (C.A. 5), 250 F. 2d 242, affirming a Memorandum Opinion of this Court; Rogers v. Commissioner (C.A. 6), 111 F. 2d 987; and Schwarzkopf v. Commissioner (C.A. 3), 246 F. 2d 731. *186 Both Brame and Carter are intelligent and experienced businessmen and we think they must have known that the money appropriated by them constituted taxable income. We can reach no other conclusion than that their purpose in failing to report it was to evade tax thereon. Furthermore, we also believe that even the smaller amounts of income which they failed to report, such as interest and capital gains, were omitted from their returns with intent to evade tax thereon. It is our conclusion that the evidence presented affirmatively and convincingly establishes that some part of the deficiency for each of the individual petitioners for each year in question is due to fraud with intent to evade tax, and we have so found as a fact. In reaching this conclusion we have not relied to any extent upon the presumption in favor of any determination of the respondent made in the notices of deficiency. The proper additions to tax under section 293(b) will be computed in the recomputation under Rule 50. Additions to Tax Under Sections 294(d)(1)(A) and 294(d)(2) of the Internal Revenue Code of 1939 In the notices of deficiency the respondent determined additions to tax in each of the years 1948 *187 through 1953 against Brame for failure to file a declaration of estimated tax. [9] Such addition must be imposed unless the petitioner shows that the failure to file was due to reasonable cause and was not due to willful neglect, the burden of proof resting upon the petitioner. Joe W. Stout, 31 T.C. 1199, affd. sub nom. Rogers v. Commissioner (C.A. 4) - F. 2d -, and R. A. Bryan, 32 T.C. 104, affd. (C.A. 4) - F. 2d -. Brame has adduced no evidence whatsoever with respect to this subject. His returns corroborate the respondent's determination that no declarations of estimated tax were filed. Under these circumstances we must hold that he is liable for proper additions to tax for each of the years under section 294(d)(1)(A). *188 The respondent also determined additions to tax against Brame for each year under section 294(d)(2) for substantial underestimation of tax. [10] However in this the respondent was in error. In Acker v. United States, 361 U.S. 87, the Supreme Court held that section 294(d)(2) does not authorize the treatment of a taxpayer's failure to file a declaration of estimated tax as equivalent to estimating his tax to be zero, and that in the case of a failure to file there are no additions to tax under that section. In the notices of deficiency the respondent determined additions to tax in each of the years 1950 through 1953 against Carter under section 294(d)(1)(A) for failure to file declarations of estimated tax. Here, as *189 in the case of Brame, the burden is upon Carter to show that his failure to file was due to reasonable cause and not due to wilful neglect. Carter has introduced no evidence whatsoever upon this subject. His returns corroborate the respondent's determination that no declarations of estimated tax were filed for those years. Accordingly, we approve the imposition of additions to tax under section 294(d)(1)(A) for those years. A different situation prevails as to the years 1948 and 1949. The respondent did make a determination in the notice of deficiency as to those years, but, rather, affirmatively alleged in an amendment to his answer that Carter is liable for additions to tax under sections 294(d)(1)(A) and 294(d)(2) for those years. Accordingly, the burden of proof is upon the respondent to show that Carter's failure to file declarations of estimated tax for 1948 and 1949 was not due to reasonable cause but was due to willful neglect. Rule 32, Rules of Practice of this Court. Since there is no evidence upon this subject, we must hold that the respondent has failed to show that Carter is *190 liable for additions to tax under section 294(d)(1)(A) for 1948 and 1949. Also, as in the case of Brame, we hold that Carter is not liable for additions to tax for any of the years under section 294(d)(2). The Corporation The respondent in the notices of deficiency determined that the corporation had unreported income in the respective amounts of $41,923.05, $44,442.37, $40,291.63, and $14,790.77 for the fiscal years ended January 31, 1949 through January 31, 1952. Although the respondent did not set forth any details as to sources of this income, his determination is presumed to be correct and the burden of proof was upon the petitioner to show that such determination was erroneous. This the petitioner has not done, having adduced very little proof with respect thereto. On the contrary, the evidence is to the effect that the books of the corporation were incomplete and unreliable and such evidence as we have indicates that the corporation did in fact understate its income in its returns. During the years in question, Commercial Credit Corporation credited to the corporation in the *191 dealer reserve account it maintained for the corporation the respective amounts of $934.58, $2,326.90, $4,324.73, and $7,972.49. These amounts constituted accrued income to the corporation in the years the accounts were credited. Commissioner v. Hansen, 360 U.S. 446, and Arthur V. Morgan, 29 T.C. 63, affd. (C. A. 9), 277 F. 2d 152. The corporation did not report the amounts credited and Bourgeois, in his audit, adjusted the corporation's income in this respect for each year, the aggregate of such amounts for the four-year period being substantially the same as the amount we have found. As pointed out hereinabove, the individuals received large amounts of unreported income computed by the bank deposits and cash expenditures method. In the calendar years 1948 through 1951 these totaled approximately $39,500, $31,000, $11,500, and $30,500. These amounts consisted principally of diversions of corporate income including amounts due the corporation from finance companies upon the discount of notes received upon sales of cars. The sales should have been entered on the books of the corporation and been reflected in its taxable income, since there *192 is no evidence to show that the cost of such sales was not taken into account. Testimony of the corporation's bookkeeper, Anderson, and of Bourgeois, was to the effect that the normal accounting practice of the corporation in the case of a credit sale in connection with which the customer's note was discounted was to debit accounts receivable in the amount of the selling price and credit sales; upon the receipt by the corporation of cash from the finance company, the cash account would be debited (increased) and the accounts receivable would be credited (reduced). In any instance where a note was discounted but the corporation did not receive the cash, there would be no debit to cash and any account receivable which has been set up would remain open. There were no open accounts other than those referred to hereinbefore. The accountant Bourgeois found the accounts of the corporation in balance (except possibly for the open accounts receivable hereinbefore referred to). Accordingly, with respect to those sales where payments on discounted notes were not received by the corporation and deposited in its bank account, it would appear logical to conclude that no accounts receivable, and *193 therefore no profit, were reflected on the books or in the returns of the corporation. This was the conclusion reached by Bourgeois in his testimony. In any event, the petitioner did not show that all such transactions were properly reflected. Upon this record we must approve the respondent's determination of income unreported by the corporation. The amounts to be used in the recomputation under Rule 50 as unreported income are those determined by the respondent in the notices of deficiency, without separately including amounts credited to dealer reserve accounts or any other specific items. In such recomputation the corporation will be entitled to deduct, as salaries, the weekly payments to the individuals for each year and the monthly payments in the last fiscal year, as well as the agreed additional amounts as travel and entertainment expenses. It is also entitled to deduct in the fiscal year ended January 31, 1952, the amount of $2,600 as legal expenses and $3,077.52 as a carry-back of a net operating loss from the year ended January 31, 1954, both as stipulated. It is not entitled to any deduction for rent for use of property, since none was owing or paid. Nor has it shown *194 that a claimed item of $2.50 as a "discount charge" in the year ended January 31, 1951, is deductible. Decisions will be entered under Rule 50. Footnotes
*. All these cases are consolidated herein for disposition; they were not consolidated for trial.↩
1. All statutory references are to the Internal Revenue Code of 1939.↩
*. These amounts were credited to the personal accounts of the individuals.↩
*. Allowable to the extent provided by statute depending upon gross income.↩
*. Allowable to the extent provided by statute depending upon gross income.↩
2. In August 1954 Carter sold his stock to Brame and severed his connections with the corporation. In connection with the sale Carter transferred to Brame all his interest in the jointly held Florida Street property and Brame transferred to Carter all his interest in the jointly owned warehouse property on North Leo or Beck Street. At the same time Carter's personal account on the corporate books was closed out and Brame's personal account was charged to that extent. In connection with the closing of Carter's personal account a check was drawn on the corporation's checking account for $52,553.76, payable to Carter; Carter deposited this in his personal checking account and then drew his personal check dated August 10, 1954, for $52,553.76, payable to the corporation; and the corporation deposited this check in its bank account. It also appears that in the over-all transactions Carter received certain used cars and certain improvements on a used car lot. Neither individual reported any dividend from any of these transactions. Later, in 1957, after Carter had become disassociated from the corporation and its name had been changed to Brame and Johnson, the corporation became indebted for certain cars which had been purchased and suit was brought against the corporation. At that time Brame sold his personal home and farm for approximately $225,000 and also sold his property on Florida Street. He paid large corporate indebtedness, including an amount of approximately $69,000 to Universal CIT Credit Corporation, exhausting the proceeds of the sales which he had made. Thereafter his personal account on the books of the corporation was closed out.↩
**. Includes compensation as election commissioner. ↩
***. This consists of notes of various individuals. There is no detailed explanation in the record of this item, but since the respondent gives the individuals credit for these items as identified deposits we have not disturbed his determination in this respect. ↩
****. This item eliminates various nontaxable receipts such as borrowed money, repayments of loans, reimbursements, and refunds.↩
*. This is salary, but treated by respondent as both monthly payments and salary. ↩
*. In this computation the respondent treated cash deposits and unidentified deposits as expenditures of cash. ↩
**. This category includes a number of items and therein the respondent gives petitioner credit for cash withdrawals from his bank account.↩
1. Cash on hand at January 1, 1948. ↩
3. Includes dividend of $90 from Fidelity National Bank reported in return. ↩
4. Includes $420 which petitioner included in return from sale of livestock.↩
2. Amount shown by respondent's computation as on hand at Dec. 31, 1952, and treated as "expenditure of cash" to be accounted for. It would be available to explain expenditures in 1953. ↩
2. This item eliminates various nontaxable receipts, such as borrowed money, repayments of loans, reimbursements, refunds of insurance, and transfers of funds from savings accounts. ↩
3. Eliminated from unidentified deposits in respondent's final computation.↩
1. This is salary and treated by respondent as such (although included under "Monthly payments".) ↩
1. Respondent treats cash deposits and unidentified deposits as expenditures of cash. ↩
3. In this item respondent gives petitioner credit for cash withdrawals from his bank account. Also for the year 1953, he credits petitioner with cash of $15,300 which was included as cash on hand at Dec. 31, 1952, and as an "expenditure of cash" in 1952 Respondent thus treats the $15,300 as available to explain expenditures in 1953. ↩
4. Includes dividends from Baton Rouge Building & Loan Assn. in 1949 and 1950, in addition to formal dividends from the corporation for 1949.↩
2. Slight unexplained variance from original computation of cash deposits. ↩
*. Cash on hand at January 1, 1948.↩
3. Even so, the transcripts of the three cases total over 1,000 pages and the number of exhibits is in excess of 100.↩
4. (a) Definition of Dividend. - The term "dividend" * * * means any distribution made by a corporation to its shareholders, whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. * * * (b) Source of Distributions. - For purposes of this chapter every distribution is made out of earnings or profits to the extent thereof, and from the most recently accumulated earnings or profits. * * *
(d) Other Distributions from Capital. - If any distribution made by a corporation to its shareholders is not out of increase in value of property accrued before March 1, 1913, and is not a dividend, then the amount of such distribution shall be applied against and reduce the adjusted basis of the stock provided in section 113, and if in excess of such basis, such excess shall be taxable in the same manner as a gain from the sale or exchange of property.↩
5. The petitioners' bookkeeper, Anderson, testified that he thought the $1,000 was paid by a check from a dealer's reserve account of some finance company. Bourgeois, the accountant, testified he had made a search of records of several finance companies but had been unable to identify the source of the payment.↩
6. It may be noted in passing that the amount Brame and Carter had in the safe deposit boxes at January 1, 1948, is important only if such cash was withdrawn and deposited or spent in the years in question. The evidence shows that they entered their safe deposit boxes infrequently, but made cash deposits and expenditures frequently. We can detect no correlation between the dates of their visits to their safe deposit boxes and the dates of their cash bank deposits and expenditures.↩
7. The respondent concedes that for the years 1951, 1952, and 1953 he allowed farm losses in arriving at his computation of net income of each individual, but now contends that this was in error, conceding that the burden of proof is upon him as to those years. However, as we view the evidence, the decision of the issue in none of the years turns upon the burden of proof.↩
8. SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY. * * *
(b) Fraud. - If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid, in lieu of the 50 per centum addition to the tax provided in section 3612(d)(2)↩.
9. SEC. 294. ADDITIONS TO THE TAX IN CASE OF NONPAYMENT. (d) Estimated Tax. - (1) Failure to file declaration or pay installment of estimated tax. - (A) Failure to file a declaration. - In the case of a failure to make and file a declaration of estimated tax within the time prescribed, unless such failure is shown to the satisfaction of the Commissioner to be due to reasonable cause and not to willful neglect, there shall be added to the tax 5 per centum of each installment due but unpaid, and in addition, with respect to each such installment dut but unpaid, 1 per centum of the unpaid amount thereof for each month (except the first) or fraction thereof during which such amount remains unpaid. * * *↩
10. Section 294(d)(2) provides in part: (2) Substantial underestimate of estimated tax. - If 80 per centum of the tax * * * exceeds the estimated tax * * * there shall be added to the tax an amount equal to such excess, or equal to 6 per centum of the amount by which such tax so determined exceeds the estimated tax * * *, whichever is the lesser. * * *↩